UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

|  |  |
|---|---|
| STACIE LAVIANO, as Personal Representative of the ESTATE OF TREY ALLYN CORNWELL, and on behalf of the estate and survivors, <br><br> Plaintiff, <br><br> v. <br><br> CENTURION OF FLORIDA, LLC, JEREMY SHIVER, KRISTINA TICHENOR, REBECCA PRICE, SHEILA MELVIN, DANIEL WINFREE, DEONE M. JOHNSON, STEVE JONES, OFFICER VALERIE BOATWRIGHT, OFFICER HAILEY LYNN-MARIE MONROE, and OFFICER TIMOTHY MICHAEL TRAINER, <br><br> Defendants. | Case No. <br><br><br> **Jury Trial Demanded** |

## COMPLAINT

Plaintiff Stacie Laviano, as Personal Representative of the Estate of Trey

Allyn Cornwell and on behalf of Mx.[1] Cornwell's survivors files this Complaint

against Centurion of Florida, LLC, Jeremy Shiver, Kristina Tichenor, Rebecca

---

[1] The Complaint will refer to Trey Cornwell, who had gender dysphoria and went by the name Michelle, using "they/them" pronouns and the honorific "Mx."

Price, Sheila Melvin, Daniel Winfree, Deone M. Johnson, Steve Jones, Officer

Valerie Boatwright, Officer Hailey Lynn-Marie Monroe, and Officer Timothy

Michael Trainer concerning their failures to adequately respond to the strong

likelihood that Mx. Cornwell would commit self-harm, which failures resulted in

their wrongful death. In support, Plaintiff alleges:

## INTRODUCTION

1.      Mx. Cornwell, a transgender woman, wrongfully died by suicide

while incarcerated at Santa Rosa Correctional Institution ("SRCI"), a men's prison

operated by the Florida Department of Corrections ("FDOC") due to the abject and

utter failures of FDOC officers and Centurion of Florida providers and nurses to

monitor Mx. Cornwell's well-being after several instances of serious self-harm and

self-mutilation.

2.      Days before their self-mutilation and suicide, Mx. Cornwell mailed a

letter to Plaintiff with the following poem:

3.      Shortly after mailing this letter to Plaintiff, as more fully described below, Mx. Cornwell mutilated their genitalia and forearms and was taken to the emergency room at a local hospital. Although the hospital initially required Mx. Cornwell to stay several days, Mx. Cornwell was promptly returned to FDOC custody at SRCI, where security and medical staff failed to adequately monitor Mx. Cornwell for further harm. Without adequate monitoring, Mx. Cornwell was able to repeatedly open their wounds, only for jail and medical staff to "stabilize" them and return them to their cell, even when Mx. Cornwell made comments that indicated clear suicidal intent, such as wanting to "die today."

4.      After being cleared to return to their cell for a third time within four (4) hours of being returned from the hospital, Mx. Cornwell became unresponsive and ultimately died. As a result of the failure to adequately respond to Mx. Cornwell's efforts to commit further self-harm, Plaintiff seeks to hold FDOC's officers, Centurion of Florida, and its medical staff, accountable for their wrongdoing.

## JURISDICTION AND VENUE

5.      Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Eighth Amendment to the Constitution.

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

3

7. Venue is proper in this district under 28 U.S.C. § 1391(b), this being the district where the claims arose and where Defendants conduct business.

8. All conditions precedent to this lawsuit have occurred, been performed, or been waived.

## PARTIES

9. Plaintiff Stacie Laviano is the duly appointed personal representative of the Estate of Trey Allyn Cornwell, having been so appointed by the probate division of the First Judicial Circuit in and for Santa Rosa County, Florida.

10. At all times relevant, Plaintiff Stacie Laviano is and was a resident of Hernando County, Florida.

11. Plaintiff—as personal representative of the Estate of Trey Allyn Cornwell—is entitled and empowered to recover for Mx. Cornwell's survivors, beneficiaries, and estate, all damages. Plaintiff brings this action on behalf of Mx. Cornwell's survivors and parents, Stacie Laviano and Troy Cornwell.

12. At all times relevant, Mx. Cornwell was a prisoner confined correctional institutions operated and controlled by FDOC, and at the time of their death, confined to SRCI.

13. Defendant Centurion of Florida, LLC, is a subsidiary of the Sullivan Brothers Family of Companies, LLC, and is principally located in Virginia and registered as a foreign limited liability company with the State of Florida.

4

Centurion of Florida has contracted with FDOC to provide medical and mental-health care to prisoners, including Mx. Cornwell. When providing medical care for prisoners in FDOC custody, Centurion of Florida stands in the shoes of FDOC. When referencing Centurion or Centurion of Florida, Plaintiff includes all parents, subsidiaries, and other affiliate corporate entities, including Sullivan Brothers Family of Companies. Centurion of Florida, LLC, is affiliated with Centurion Correctional Healthcare of New Mexico, LLC, Centurion Health, Centurion Healthcare Inc., Centurion of Vermont, LLC, and other "Centurion" healthcare entities that are contracted across the country to provide healthcare to correctional facilities. Each of these corporate affiliates maintain the same policies and practices which Plaintiff alleges were the moving force behind Mx. Cornwell's death. At all relevant times during the events at issue in this case, Centurion of Florida was acting under color of law by and through its agents, employees, and contractors identified herein and, on information and belief, other presently unknown individuals. Its utilization management staff members, Director of Mental Health, and Medical Director at SRCI, and Regional Medical Director are the final policymakers for purposes of the unconstitutional policies, practices, and customs alleged in this complaint.

14.     Defendant Jeremy Shiver, PsyD., was at all times Centurion of Florida's Mental Health Director. Dr. Shiver is being sued in his individual capacity. At all times relevant, Dr. Shiver was acting under color of law.

15.     Defendant Daniel Winfree was at all times relevant a registered nurse and employee or agent of Centurion of Florida at SRCI. Mr. Winfree is being sued in his individual capacity. At all times relevant, Mr. Winfree was acting under color of law.

16.     Defendant Kristina Tichenor was at all times relevant a registered nurse and employee or agent of Centurion of Florida at SRCI. Ms. Tichenor is being sued in her individual capacity. At all times relevant, Ms. Tichenor was acting under color of law.

17.     Defendant Sheila Melvin was at all times relevant an advance practice registered nurse and employee or agent of Centurion of Florida at SRCI. Ms. Melvin is being sued in her individual capacity. At all times relevant, Ms. Melvin was acting under color of law.

18.     Defendant Rebecca Price was at all times relevant a licensed practical nurse and employee or agent of Centurion of Florida at SRCI. Ms. Price is being sued in her individual capacity. At all times relevant, Ms. Price was acting under color of law.

19.     Defendant Deone M. Johnson was at all times relevant a licensed practical nurse and employee or agent of Centurion of Florida at SRCI. Ms. Johnson is being sued in her individual capacity. At all times relevant, Ms. Johnson was acting under color of law.

20.     Defendant Steve Jones was at all times relevant a licensed practical nurse and employee or agent of Centurion of Florida at SRCI. Mr. Jones is being sued in his individual capacity. At all times relevant, Mr. Jones was acting under color of law.

21.     Defendant Officer Valerie Boatwright was at all times relevant a correctional officer and employee or agent of FDOC at SRCI. Officer Boatwright is being sued in her individual capacity. At all times relevant, Officer Boatwright was acting under color of law.

22.     Defendant Officer Hailey Lynn-Marie Monroe was at all times relevant a correctional officer and employee or agent of FDOC at SRCI. Officer Monroe is being sued in her individual capacity. At all times relevant, Officer Monroe was acting under color of law.

23.     Defendant Officer Michael Trainer was at all times relevant a correctional officer and employee or agent of FDOC at SRCI. Officer Trainer is being sued in his individual capacity. At all times relevant, Officer Trainer was acting under color of law.

7

24.   Plaintiff has been required to engage the services of the undersigned counsel and is entitled to an award of reasonable attorneys' fees and costs.

## FACTUAL ALLEGATIONS

### A. Centurion of Florida and FDOC knew of Mx. Cornwell's History of Self-Harming Behavior

25.   Mx. Cornwell entered FDOC custody on November 21, 2022.

26.   Two months later, in January 2023, Mx. Cornwell was admitted to the Wakulla Crisis Stabilization Unit  for Self-Harm Observation Status ("SHOS") due to self-mutilation of their scrotum for the second time in a two-week period.

27.   According to Centurion of Florida staff, Mx. Cornwell refused to be sutured and stated they would continue self-harm unless they could access mental-health services.

28.   At that time, Centurion of Florida staff diagnosed Mx. Cornwell with: "identity problem"; "self harming behavior"; "mood swings; gender dysphoria; bipolar disorder; and other issues." At that time, Mx. Cornwell was in special housing status for "cutting of the scrotum" and was treated by Centurion of Florida staff and psychologists. A Centurion of Florida psychologist diagnosed Mx. Cornwell with "self harming behavior" and instructed FDOC staff to provide safety utensils, no bones in their food, and a Styrofoam tray to prevent further self-harm.

29.     The remainder of Mx. Cornwell's incarceration, while Centurion of Florida was contracted to manage health services to inmates, was marked with multiple episodes of attempts to commit serious self-harm and disfigurement. According to FDOC's internal documents concerning Mx. Cornwell, they experienced "strong urges to engage in self-harm or attempt suicide."

30.     For example, on May 25, 2023, FDOC records noted that Mx. Cornwell repeatedly banged their head forcefully against their cell wall and three days later attempted to commit serious self-harm.

31.     On June 11, 2023, Mx. Cornwell attempted to smuggle a bottle of Visine into their cell by placing it in their rectum. It is well known to FDOC staff that Visine, when ingested orally, is a potentially lethal substance.

32.     On June 27, 2023, Mx. Cornwell attempted castration again.

33.     On July 4, 2023, Mx. Cornwell attempted self-harm again and was placed on special housing status.



34.     Further self-harm attempts were noted throughout the summer and fall, culminating with a suicide attempt on November 25, 2023, which resulted in Mx. Cornwell's hospitalization.

35.     Thereafter, in early December 2023, Mx. Cornwell was returned to general population, despite these serious efforts to commit self-harm.

36.     While under Centurion of Florida's control, Mx. Cornwell was prescribed various medications to help with suicidal behavior. For example, Mx. Cornwell reported that Naltrexone helped stopped cutting behaviors. This drug, however, was no longer on the formulary, and Mx. Cornwell stopped receiving it in December 2023. Mx. Cornwell was also approved for Abilify, which was requested off the formulary as well, for period of 90 days.

### B. On January 24, 2024, Mx. Cornwell Mutilates Their Forearms and Genitals at SRCI Resulting in Hospitalization and Blood Transfusion

37.     Several weeks later, on or about January 24, 2024, Mx. Cornwell again attempted serious self-harm—they mutilated their forearms and scrotum and started to bleed out. Mx. Cornwell had indicated to Centurion of Florida staff at SRCI that not being able to grow their hair long was a trigger for suicidal ideation.

38.     Following the incident, on Mx. Cornwell underwent a mental health evaluation with TaNeal Walls, a Centurion of Florida mental health counselor. Mx. Cornwell told Walls: "I'm not okay," "I'm willing to die," and "I don't care if I die. There's nothing that can numb the pain."

39.     Mx. Cornwell explained that they needed treatment or their gender dysphoria and that not having the hair and attire they wanted was overwhelming and triggering suicidal ideations. Mx. Cornwell said "I'm tired of life, it's a heavy

10

burden." At that time, Walls noted that Mx. Cornwell was covered in dried blood from the earlier self-harming episode. They were sobbing at the visit.

40.    Jeremy Shiver, PsyD., Centurion of Florida's Mental Health Director, also observed Mx. Cornwell that day. Dr. Shiver noted that although Mx. Cornwell alleged self-harm with fingernails, "this was highly suspect as the laceration was notably precise and clean for such a method."

41.    On information and belief, Dr. Shiver did not follow up to determine whether Mx. Cornwell possessed any contraband or other items that could be used to commit further self harm.

42.    On January 25, Centurion of Florida psychiatric clinician Joseph Kelley requested authorization for Mx. Cornwell to continue receiving Abilify for their bipolar disorder, which medication was no longer on the formulary approved by Centurion of Florida. That request was approved on January 29, following Mx. Cornwell's death.

43.    During this period, Mx. Cornwell was tachycardic and in distress.

44.    Despite the emergency associated with Mx. Cornwell's January 24 mutilation, there were no doctors at SRCI who could perform appropriate care. Instead, Centurion of Florida licensed practice nurses were operating outside the scope of their licensed practice performing trauma wound care on Mx. Cornwell.

11

45.    After being taken to the infirmary on or about January 25, Mx. Cornwell was transported to Santa Rosa Medical Center on January 26 at around 1:30 a.m.

46.    When they arrived at the hospital on or about January 26, 2024, staff noted that Mx. Cornwell "presented from the jail due to self-inflicted cuts to the forearm bilaterally and to scrotal area. Lacerations to the left arm and scrotum were repaired with sutures at the facility prior to arrival at the hospital." According to those hospital records, "Patient reports being in a psychiatry program at the jail. Patient instructed to follow-up with psychiatrist and primary care at the facility." The hospital diagnosed Mx. Cornwell with anemia due to acute blood loss.

47.    Mx. Cornwell was discharged from the hospital on or around January 27 after 10 a.m. Providers at the hospital initially determined that they should stay "at least 2 nights" at the hospital.

48.    On information and belief, Mx. Cornwell was discharged early due to intervention by agents and employees of Centurion of Florida.

**C. On January 27, 2024, Mx. Cornwell Returns to SRCI, Where Medical and Correctional Staff Allow Them to Self-Harm Throughout the Day, Resulting in Death**

49.    Mx. Cornwell arrived at SRCI Annex around 11:37 a.m.

12

50. When weighed at SRCI that morning following blood transfusions, Mx. Cornwell weighed 168 lbs. Following the self-harming behavior on January 25, Centurion of Florida staff tabulated Mx. Cornwell's weight at 154 lbs.

51. Centurion of Florida staff bandaged Mx. Cornwell's wound and Nurse Melvin directed them to be returned to their cell in Q Dormitory to continue inpatient mental health care.

52. Mx. Cornwell was to be placed in confinement under observation with 15-minute safety and security checks.

53. Mx. Cornwell was placed into Cell 1108 by themselves.

54. Sometime between placement in the cell and 1 p.m., Mx. Cornwell committed self-harm.

55. Officer Boatwright arrived on scene during a security check and noted blood in the cell. She radioed for additional units to respond. Officer Monroe responded. When she arrived, Mx. Cornwell was lying on their side with their eyes open. They were not responding to calls from the officers and were not moving. Officers Monroe and Boatwright radioed for additional assistance. Officers Trainer and Graham also arrived and noted blood in the cell.

56. Mx. Cornwell was taken by Officers Graham and Trainer to medical.

57. Nurse Tichenor assessed Mx. Cornwell's wound with Nurses Price, Melvin, and Jones present.

13

58. According to Officer Trainer, when Mx. Cornwell was in medical they indicated they would continue self-harming when returned to their cell. The officers and nursing staff heard Mx. Cornwell threaten to continue self-harming behavior.

59. Nursing staff read Mx. Cornwell's blood pressure at 93/60, which is considered borderline hypotensive. Mx. Cornwell's reopening of their wound and additional blood loss reduced the volume of blood circulating in their body, lowering the pressure.

60. With this knowledge, Nurses Jones, Melvin, Tichenor, and Price should have taken steps to ensure that Mx. Cornwell received emergency medical attention for blood loss.

61. Instead, they discharged Mx. Cornwell back to their cell, with instructions that they would be evaluated every six hours.

62. At no point did any licensed medical doctor observe or interact with Mx. Cornwell. Centurion of Florida's on-call doctor was offsite, leaving Nurse Melvin—an advance practice nurse—in charge and acting outside the scope of her license.

63. Mx. Cornwell was then returned to their cell after 2 p.m. by Officers Trainer and Graham, who had heard Mx. Cornwell state that they would continue self-harming behavior.

14

64. During another 15-minute check, several minutes later, Officer Boatwright observed Mx. Cornwell facing the back of the cell with blood present. Officer Boatwright stated she asked Mx. Cornwell what they were doing, and Mx. Cornwell bit their arm and proceeded to reopen the wound. According to Officer Boatwright, Mx. Cornwell stated "what do you think I'm doing?"

65. Officer Boatwright again radioed for additional units. Officer Monroe responded again. Nurse Johnson was also called to observe Mx. Cornwell in the cell. She instructed the officers to bring Mx. Cornwell back to medical.

66. Officers Trainer and Graham returned to escort Mx. Cornwell to medical. During this escort, Mx. Cornwell exposed their genitals and defecated on the floor.

67. Nurse Johnson told investigators that when Mx. Cornwell arrived at medical, they told everyone there that they defecated and that they had HIV and wanted to "contaminate" the officers and nurses before dying.

68. Despite Mx. Cornwell telling Officers Graham and Trainer and Nurses Johnson, Winfree, Melvin, and Price that they were trying to "contaminate" them before they died of self-inflicted wounds, nursing staff cleansed and re-dressed Mx. Cornwell's wounds and agreed that Mx. Cornwell would be returned to their cell.

15

69. Sometime after 2:30 p.m., Mx. Cornwell was escorted back to their cell, again without seeing a doctor or psychiatrist. Officer Monroe and others remained at Mx. Cornwell's cell for some time thereafter because Mx. Cornwell fell to the ground while restrained. It took about an hour for Officers Monroe and Trainer to gain Mx. Cornwell's cooperation to return the restraints.

70. Around the time Mx. Cornwell was returned to their cell for a second time that day, Nurse Tichenor issued a staff referral for Mx. Cornwell to see a mental health provider. Despite Mx. Cornwell's low blood pressure, loss of blood following hospitalization for blood transfusions, and threats of continued self-harm, none of the Centurion of Florida nursing staff at SRCI that day took Mx. Cornwell to see a doctor, psychiatrist or for any emergency care. Nor did they ask security staff to further monitor Mx. Cornwell or take any steps to prevent further self-harm.

71. Around 3:30 p.m. the shift changed for Q Dormitory security staff.

72. Around that time, an orderly observed that Mx. Cornwell had committed self-harm for a third time that day. He informed Officer Monroe, who returned to Mx. Cornwell's cell. She banged on the door to get Mx. Cornwell's attention to no avail. Officer Monroe radioed for additional units—the third time that day officers were called to Mx. Cornwell's cell for self-harming behavior.

73. Lieutenant John Bradley and Officer Johnathan Sheldon arrived.

16

74. When Lieutenant Bradley arrived, he found Mx. Cornwell on the floor in a pool of blood and not responding.

75. He advised his subordinates to put on protective gear for a "wellness check."

76. Mx. Cornwell finally responded when the officers breached the cell. According to Officer Sheldon, blood continued to flow from Mx. Cornwell's arm even after gauze was applied.

77. Officer Sheldon took Mx. Cornwell to medical in a wheelchair.

78. Lieutenant Bradley placed a spit shield on Mx. Cornwell while in medical.

79. Nurse Winfree began to address Mx. Cornwell's wounds.

80. Nurses Price and Tichenor observed that Mx. Cornwell was covered in feces and blood. Nurse Johnson mentioned to investigators that during this third encounter, Mx. Cornwell again told staff that they wanted to die that day.

81. Around 4 p.m., Nurse Winfree issued another referral for mental health to Centurion of Florida's utilization management. At this point, Lieutenant Bradley inquired about placing Mx. Cornwell in five-point restraints to prevent further self-harming behavior.

82. Nurse Price indicated to security staff that Mx. Cornwell needed to remain in medical until she could confer with Nurse Melvin, who was assigned as

17

the medical director of the facility by Centurion of Florida, even though she was not a medical doctor. Other medical doctors—Dr. Landry and Perry—treated Mx. Cornwell prior to their hospitalization, but they were not at the facility upon their return, leaving Mx. Cornwell's care following serious self-harm and acute blood loss requiring transfusion to be left to a nurse acting outside the scope of her practice.

83. Further, despite Dr. Shiver knowing that Mx. Cornwell committed self-harm requiring hospitalization, and believing that Mx. Cornwell had used a tool to commit self-harm, Dr. Shiver failed to follow up on Mx. Cornwell's mental health status following their return from the hospital. Dr. Shiver failed to also perform any mental health evaluations or observations or otherwise confirm that Mx. Cornwell was receiving appropriate medication for their mental health disorders. Instead, despite knowledge of serious medical needs and mental health conditions, Dr. Shiver failed to take any steps to ensure continuation of treatment or care following Mx. Cornwell's return from the hospital.

84. Nurse Melvin then informed medical staff that—following a third trip to the infirmary for self-harm and despite a dangerously low blood pressure and acute loss of blood—Mx. Cornwell should be released back to their cell.

85. Prior to release back to their cell, nursing staff attempted to obtain vital signs. Nurses Price and Johnson had difficulty obtaining vital information

18

while Mx. Cornwell was in the wheelchair. Staff moved them to the bed to take vital signs there, but noticed once they were on the bed that Mx. Cornwell's body was limp. Nurse Tichenor noted that Mx. Cornwell did not have a pulse. Nurse Winfree could not obtain a manual pulse and began chest compressions. Nurse Price activated EMS.

86.    Less than an hour later, Mx. Cornwell was pronounced dead.

87.    The medical examiner labeled the cause of death as suicide, with complications from self-inflicted incised wounds. Mx. Cornwell was diagnosed with anemia secondary to blood loss from wounds.

88.    Mx. Cornwell repeatedly told Defendants that they were going to die that day, that they would not stop self-harming. Instead of doing anything to stop them, Defendants simply made sure his wounds were cleansed and bandaged following each time Mx. Cornwell was found on the ground in a pool of blood, following hospitalization for self-harm requiring blood transfusions.

89.    Mx. Cornwell's mother and personal representative seeks damages against Defendants for their failures to prevent Mx. Cornwell's preventable death.

**COUNT I – Deliberate Indifference to a Strong Likelihood of Self-Harm**
**(against Defendants Tichenor, Price, Melvin, Winfree, Johnson, Jones, Boatwright, Monroe, and Trainer)**

Plaintiff repeats and re-alleges paragraphs 1 through 89 above, as if fully set forth herein and further alleges:

19

90. Under the Eighth Amendment, Defendants Tichenor, Price, Melvin, Winfree, Johnson, Jones, Boatwright, Monroe, and Trainer were required to reasonably respond to a strong likelihood that a prisoner would commit self-harm.

91. These Defendants each knew there was a substantial risk and strong likelihood of self-harm to Mx. Cornwell.

92. Each Defendant was aware of facts from which the inference could be drawn that a substantial risk of serious harm and strong likelihood of self-haram existed.

93. These Defendants knew, among other things, that Mx. Cornwell had committed self-harm requiring hospitalization and blood transfusion. Defendants knew that Mx. Cornwell was on SHOS for self-harm risk. Despite this knowledge, Defendants allowed Mx. Cornwell to commit at least three separate acts of self-harm throughout the day resulting in serious loss of blood resulting in low blood pressure and continued reopening of their wounds. While Defendants had this knowledge, Defendants also knew that Mx. Cornwell had stated that they would continue self-harm and that they would die that day.

94. Despite all this knowledge of a strong likelihood that Mx. Cornwell would continue to commit self-harm, these Defendants took no meaningful action to stop it.

20

95. In this way, these Defendants evinced deliberate indifference and/or a conscious disregard of the risk of serious harm that Mx. Cornwell faced.

96. As a direct and proximate result of these Defendants' failure adequately respond to Mx. Cornwell's strong likelihood of self-harm, Mx. Cornwell experienced physical and emotional pain and suffering, and ultimately death.

97. The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Mx. Cornwell's rights.

98. Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

## <u>COUNT II – Deliberate Indifference to a Strong Likelihood of Self-Harm</u>
### (against Defendant Shiver)

Plaintiff repeats and re-alleges paragraphs 1 through 89 above, as if fully set forth herein and further alleges:

99. Under the Eighth Amendment, Defendant Shiver was required to reasonably respond to a strong likelihood that a prisoner would commit self-harm.

100. He knew there was a substantial risk and strong likelihood of self-harm to Mx. Cornwell.

101. He was aware of facts from which the inference could be drawn that a substantial risk of serious harm and strong likelihood of self-haram existed.

21

102.   He knew that Mx. Cornwell had committed self-harm requiring hospitalization and blood transfusion. He knew that Mx. Cornwell was on SHOS for self-harm risk and suffered from a serious mental health disorder. He also knew that Mx. Cornwell committed self-harm with some object in their cell.

103.   Despite this knowledge, Defendant Shiver failed to adequately respond to the risk of further self-harm. Specifically, Defendant Shiver made no attempts to ensure that Mx. Cornwell's cell was clear of any items that could be used to commit further self-harm. Defendant Shiver also made no attempts to meet with or evaluate Mx. Cornwell following their return from the hospital to ensure that they had no access to items to commit self-harm or any intention to commit further self-harm. Defendant Shiver also made no attempt to ensure that Mx. Cornwell had access to a physician, allowing them to be provided care only from nurses acting beyond the scope of their practice.

104.   In this way, these Defendant Shiver evinced deliberate indifference and/or a conscious disregard of the risk of serious harm that Mx. Cornwell faced.

105.   As a direct and proximate result of Defendant Shiver's failure adequately respond to Mx. Cornwell's strong likelihood of self-harm, Mx. Cornwell experienced physical and emotional pain and suffering, and ultimately death.

22

106.    The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Mx. Cornwell's rights.

107.    Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

## COUNT III – Failure to Treat
**(against Defendants Tichenor, Price, Melvin, Winfree, Johnson, Jones, Boatwright, Monroe, and Trainer)**

Plaintiff repeats and re-alleges paragraphs 1 through 89 above, as if fully set forth herein and further alleges:

108.    Under the Eighth Amendment, Defendants Tichenor, Price, Melvin, Winfree, Johnson, Jones, Boatwright, Monroe, and Trainer knew, and have known, that Mx. Cornwell suffered from serious medical needs, yet they failed and intentionally refused to provide the necessary aid and treatment that would alleviate them.

109.    They disregarded the risks and harms by failing and intentionally refusing to do anything that would remedy Mx. Cornwell's serious medical needs—specifically their self-harming behavior and their acute blood loss.

110.    In that regard, these Defendants have been deliberately indifferent to the serious medical needs of Mx. Cornwell.

111.    Specifically, each of these Defendants knew that Mx. Cornwell was previously admitted to a hospital for self-harm resulting in blood loss and the need for blood transfusions.

112.    On or about January 27, 2024, each of these Defendants either observed or knew that Mx. Cornwell reopened their wounds and profusely bled in their cell, to the point that Mx. Cornwell was lying in a pool of their blood.

113.    These Defendants also knew that as a result of Mx. Cornwell's blood loss, they suffered from low blood pressure.

114.    Despite such knowledge, these Defendants failed to adequately respond to Mx. Cornwell's blood loss and self-harming behavior. Instead of ensuring that Mx. Cornwell was treated for their blood loss following a blood transfusion, Defendants only ensured that Mx. Cornwell's wounds were re-bandaged before they were placed back into their cell. Despite Mx. Cornwell repeatedly opening their wounds throughout the day and being found in a pool of blood, no Defendant took any steps to ensure that Mx. Cornwell was treated for their blood loss and hypotension.

115.    As a direct and proximate cause of this deliberate indifference, Mx. Cornwell experienced physical and emotional pain and suffering, and ultimately death.

24

116.   Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

### COUNT IV – *Monell* Liability
### (against Centurion of Florida)

Plaintiff repeats and re-alleges paragraphs 1 through 89 above, as if fully set forth herein and further alleges:

117.   As a prisoner, Mx. Cornwell had an Eighth Amendment right to receive timely and adequate medical treatment for a serious medical condition.

118.   Centurion of Florida was deliberately indifferent for purposefully ignoring Mx. Cornwell's serious medical needs in violation of the Eighth Amendment right to be free from cruel and unusual punishment.

119.   Mx. Cornwell's injuries were proximately caused by the policies and practices of Centurion of Florida.

120.   Prior to and during the events giving rise to Plaintiff's Complaint, Centurion maintained policies and practices pursuant to which prisoners like Mx. Cornwell with serious mental-health needs were routinely denied access to psychiatric care despite instances, like here, where the prisoner made a direct threat of suicide or self-harm to staff.

121.   Further, Centurion of Florida maintained official policies and widespread practices wherein its staff would delay urgent referrals for medical and

25

psychiatric problems rather than send mentally ill self-harming patients, like Mx. Cornwell, to immediate specialists or for urgent medical treatment.

122. Additionally, Centurion of Florida maintained policies and practices wherein its staff would only perfunctorily treat prisoners rather than providing them with access to necessary medical care, such as access to blood transfusions or emergency medical care in the case of Mx. Cornwell.

123. Centurion of Florida maintained an official policy and widespread practice of depriving prisoners access to necessary and comprehensive mental health care for serious mental illness, self-harming behavior, and suicidal tendencies.

124. Centurion of Florida maintained an official policy and widespread practices of allowing patients to languish in their cells alone while undergoing serious medical emergencies—including those related to serious mental illness—instead of providing them with medical care.

125. Finally, Centurion of Florida maintained policies and practices where it would permit nurses, like Nurse Melvin, to provide acute care to prisoners, like Mx. Cornwell, outside the scope of their license and practice. Indeed, on the day Mx. Cornwell died, she was never seen by a doctor with Centurion of Florida.

126. Specifically, there exist policies and widespread practices at FDOC—through Centurion of Florida's management of healthcare delivery— pursuant to

26

which prisoners receive unconstitutionally inadequate healthcare, including policies and practices in which healthcare staff contracted by Centurion of Florida: (a) commonly disregard reports by patients of objectively serious symptoms; (b) refuse to provide adequate treatment to patients; (c) refuse to timely conduct or obtain mental health assessments for patients or comply with referrals to specialists; (d) fail to create sensible treatment plans for patients whose health or mental-health status requires the same; (e) fail to ensure continuity of care (such as discontinuing non-formulary medications that are successful at reducing self-harming behavior); (f) prioritize profits at the expense of constitutionally adequate care; (g) fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; (h) refuse and/or fail to provide any medical care whatsoever for defined medical problems; and (i) permit providers and nurses to act outside the scope of their practice to oversee medical care and treatment.

127.   These policies and practices were allowed to flourish because Centurion of Florida, which directs the provision of healthcare services at SRCI (including its Annex) and FDOC, directly encouraged the very type of misconduct at issue here and failed to provide adequate training and supervision of its employees and agents.

128.   These policies and practices flourish at Centurion and the entities which contract its services because Centurion prioritizes profit over patients.

129.   It is cheaper to house prisoners in correctional facilities rather than transfer them to the hospital, where the correctional entity will be responsible for the expenses associated with that hospital stay. Accordingly, Centurion discourages practitioners from referring patients to the hospital, intervenes to ensure that patients are returned from the hospital to the correctional facility promptly, and attempts to handle emergencies in-house, even when such care is beyond the capabilities of its practitioners.

130.   It is cheaper to hire and employ nurses as opposed to professionals with a broader scope of practice, such as a medical doctor. Accordingly, Centurion of Florida keeps very few doctors on its payroll, allows patient medical care to be directed by nurses and other professionals acting beyond the scope of their practice, and limit patient access to medical doctors. In other words, Centurion of Florida chronically and intentionally understaffs its facilities to save money.

131.   As the Court in *Cineus v. Florida Department of Corrections* noted when denying a motion to dismiss *Monell* claims against Centurion, other prisoners incarcerated in facilities operated by Centurion of Florida affiliates have suffered the same constitutional violations. 2022 WL 4448599, at *6 (M.D. Fla. Sept. 23, 2022). There, the plaintiff identified the following inmates who received

28

constitutionally deficient care, like Mx. Cornwell:

> For example, Michael Langston died after suffering a stroke in prison because Centurion of Tennessee refused to refer him to an outside medical provider and instead kept him in the prison infirmary. Adonus Encinias committed suicide after Centurion of New Mexico refused to refer him to an outside medical provider for his severe mental illness. Four hours after Encinias's death, Richard Kosirog, another inmate at the same prison, committed suicide after Centurion of New Mexico had reduced Kosirog's antipsychotic medication to save money. Also, Jerry Sisneros suffered permanent damage to his spine because Centurion of New Mexico refused to refer him to an outside medical provider and instead only prescribed medication.

*Id.*

132.   Centurion of Florida, including all its corporate affiliates, is one of the largest correctional healthcare companies and is notorious for providing low bids to government entities in order to secure large contracts to provide healthcare to correctional facilities. Once it has obtained a contract, Centurion provides cheap, substandard services in order to stay within the financial confines of their low contract bids.

133.   Centurion of Florida has at least 11 regional affiliates—more than any other correctional healthcare system—resulting in almost 300,000 incarcerated people across the United States being subject to their care.

134.   As a result of their profit-motivated policies and practices, Centurion of Florida and its affiliates have been subject to over 100 lawsuits, a Department of Justice investigation, and state audits.

29

135.   One of the lawsuits alleged the following of Centurion: "Broken bones, abscesses, diabetes and a host of other injuries and maladies routinely go without examination, much less medically effective treatment…For example, plaintiffs in this action insert their own catheters, treat their own stab wounds, vomit up blood, teeter on the verge of diabetic coma, and suffer through seizures without medical care."

136.   In 2023, Othel Moore was subject to such significant body restraint and pepper spray by officers that he struggled to breathe, but was placed in his cell alone, fully restrained for thirty minutes. Despite complaining to Centurion staff that he could not breathe, he died without receiving so much as a medical examination.

137.   A criminal justice advocate in Missouri, whose prison system contract with a Centurion affiliate, reported the following to the Missouri Independent:  "I have spoken to more than 20 nurses and former staff members in the past few weeks and they have all shared major concerns with the quality and safety of medical care…Eleven nurses stated that they were asked to cover unsafe caseloads, including one nurse who reported that they were assigned to cover an entire wing alone."

138.   The state of Missouri fined Centurion approximately $3 million of a $215 million contract because Centurion failed to meet the standards outlined in its

30

contract.

139.   In a Kansas facility, Centurion did nothing more than prescribe Tylenol for a 75-year-old man who complained of a grapefruit size hernia in his chest, arthritis in his joints, broken wires near his heart from a failed procedure, and agonizing associated pain.

140.   Another Kansas prisoner told local reporters: "I lost count on how many days, months, weeks or years [DOC] staff has let something go untreated. […] They will let someone die in here before they try to help."

141.   Between January 2021 and May 2022, Centurion was fined almost a million dollars across about 5,000 discrete fines for failing to meet contract standards.

142.   A federal court in Arizona found that Centurion subjected Arizona's prison system to a shortage of registered nurses, nurse practitioners, and physicians, describing the staffing at Arizona facilities as "woefully insufficient." There, Corizon had used licensed vocational nurses, who are not trained to recognize symptoms of serious illnesses, with screening prisoner medical request forms.

143.   In New Mexico, a prisoner alleged in a lawsuit that she developed cirrhosis of the liver after she was chronically deprived standard treatment of her hepatitis while under Centurion's care.

31

144.    Another New Mexico prisoner brought a lawsuit alleging that Centurion failed to address his repeated reports of severe lower back pain, which ultimately led to the development of abscesses and an inability to walk.

145.    In Florida, Centurion has been accused of violating prisoners' rights in several cases. For example, in *Elmer Williams v. Ricky Dixon et al.*, Centurion of Florida was accused of maintaining an unconstitutional policy and practice where, among other things, an Area of Critical Need[2] doctor "monitored" Mr. Williams's worsening prostate cancer despite Centurion of Florida approving an urgent referral to a specialist. Under Centurion of Florida's ACN's care, Mr. Williams's prostate cancer became metastatic. The Department of Corrections granted compassionate medical release to Mr. Williams.

146.    In *McCrimmon v. Centurion of Florida et al.*, Curtis Dettmann, a state prisoner under Centurion of Florida's care, showed signs of an active infection following hospitalization and complained of nausea, vomiting, and incontinence. Despite complaints and worsening condition, Centurion of Florida staff failed to order any attests or evaluate him. Even though he became wheelchair-bound and his condition worsened, Centurion of Florida's doctor discharged Mr. Dettmann to general population. Shortly thereafter, Mr. Dettmann died of Clostridium difficile.

---

[2] An Area of Critical Need (or ACN) doctor is one who, generally, does not qualify to practice law, but is permitted to practice in certain areas, such as rural areas or prisons.

147.  In *Jacqueline Burge v. Centurion of Florida et al.*, for a year Centurion of Florida staff failed to provide blood work or return Ms. Burge to the University of Florida for Mohs surgery to remove a basal cell carcinoma on her eye, despite the UF specialist requesting prompt surgery. Ms. Burge attributed the failure to cost-savings because she was close to her release date from prison.

148.  These examples demonstrate that this problem is not isolated to the events that transpired in January 2024 at SRCI.

149.  Here, rather than send Mx. Cornwell back to the hospital to be treated by a psychiatrist and provided additional blood transfusions after severe blood loss through the day, to save money Centurion of Florida staff merely cleansed Mx. Cornwell's wounds, re-bandaged them, and then returned Mx. Cornwell to their cell, all under the supervision of a nurse.

150.  Centurion of Florida staff did these things despite hearing verbalized threats of self-harm (that Mx. Cornwell would keep opening their wounds) and suicide (that Mx. Cornwell told Centurion of Florida staff that they would die that day).

151.  Despite hearing these things, Centurion of Florida staff failed to take Mx. Cornwell to see a doctor or psychiatrist who could prescribe psychotropic medication to alleviate their disordered and self-harming behavior.

152. Accordingly, Centurion of Florida violated Mx. Cornwell's rights by maintaining practices and policies that carried the force of law and were the moving force of these constitutional violations.

153. These policies and practices were able to exist and thrive within FDOC because Centurion of Florida (as the contractor to oversee health services at FDOC, including psychiatric services) was deliberately indifferent to the problem, thereby effectively ratifying it.

154. Centurion of Florida also acted to violate Mx. Cornwell's constitutional rights through the actions and failures to act by individuals with final policymaking authority for it.

155. Mx. Cornwell's ability to continue to commit self-harm throughout their incarceration period with FDOC and specifically at least three times in a four-hour period on January 27, 2024, were caused by persons who acted pursuant to the foregoing policies and practices in engaging in the misconduct described herein.

156. Mx. Cornwell's inability to receive care for their acute anemia and blood loss was caused by persons who acted pursuant to the foregoing policies and practices in engaging in the misconduct described herein.

157. In addition to these unconstitutional policies, practices, and customs, Centurion of Florida also failed to train and supervise its staff in adequate

34

responses to verbalized threats of self-harm and suicide as well as indicia of a strong likelihood of self-harm, as set forth above.

158.   As a proximate cause of Centurion of Florida's unconstitutional policies, customs, practices, and its failure to train and/or supervise its staff, Centurion of Florida violated Mx. Cornwell's constitutional rights.

159.   Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

## **PRAYER FOR RELIEF**

As a result of the tragic and untimely death of Mx. Cornwell, Plaintiff seeks the following damages against Defendants:

A. Compensatory damages;

B. Punitive damages;

C. Nominal damages;

D. An order awarding Plaintiff her reasonable attorney's fees, litigation expenses and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

E. Such other and further relief deemed just and proper.

## **JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues so triable.

Dated: May 29, 2026.

/s/ James M. Slater

James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
Tel. (404) 458-7283
james@slater.legal

*Attorneys for Plaintiff Stacie Laviano*