**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| Stacie Laviano,<br><br>Plaintiff,<br><br>v.<br><br>Centurion of Florida, LLC *et al*.,<br><br>Defendants. | Case No. 3:26-cv-03970-TKW-ZCB |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## INTRODUCTION

The Eighth Amendment does not permit jailers to stand by while a prisoner they know to be suicidal continuously self-mutilates and bleeds to death in their custody. The Complaint alleges that is what happened to Mx. Trey Allyn Cornwell.

Suicidal throughout their incarceration, Mx. Cornwell repeatedly self-harmed and attempted suicide. On January 24, 2024, after the medications controlling those urges were stopped, Mx. Cornwell cut deep lacerations and bled badly enough to be hospitalized for anemia. Doctors advised a multi-night stay, but Mx. Cornwell was returned after one night, their wounds held closed only by sutures.

Mx. Cornwell told staff they intended to bleed out through those wounds. The danger was obvious—Mx. Cornwell needed only to reopen the sutured lacerations—yet staff repeatedly returned Mx. Cornwell, alone, to a cell, under fifteen-minute observation. Fifteen minutes was obviously plenty of time for Mx. Cornwell to reopen the wounds. Three times, they were found bleeding in their cell, carried to the infirmary hypotensive, patched up, and sent back under the exact conditions that allowed them to reopen their wounds: alone in a cell under fifteen-minute watch, without their necessary medications. They did this as Mx. Cornwell made statements of suicidal intent.

Mx. Cornwell's continued self-mutilation made their suicidal intent and risk of severe blood loss obvious. Yet, staff continuously decided to follow the same course that facilitated Mx. Cornwell's deterioration, never escalating Mx. Cornwell's urgent needs to a physician. As staff prepared to send Mx. Cornwell back to their cell once more, Mx. Cornwell died of blood loss.

All Defendants move to dismiss, and the Guard Defendants invoke qualified immunity. Except as noted below, the motions should be denied: the Complaint pleads deliberate indifference to an obvious, known risk of suicide, and Centurion's settled culture of allowing such medical failures to occur.

## FACTUAL ALLEGATIONS

The Complaint alleges that Mx. Cornwell entered the FDOC in November 2022. ECF 1 ¶ 25. Mx. Cornwell, who was housed at a men's prison, was assessed as experiencing gender dysphoria and suffering from multiple mental health conditions, including bipolar disorder. *Id.* After multiple acts of self-mutilation, including cutting of the scrotum, Mx. Cornwell was placed on self-harm observation status in January 2023. ECF 1 ¶¶ 25-26, 28. Mx. Cornwell's mental health diagnoses also included self-harming behavior. *Id.* ¶ 28.

Despite being placed on self-harm observation status, Mx. Cornwell repeatedly engaged in self-harm and attempted suicide. An FDOC officer assessed

Mx. Corwell as experiencing "strong urges to engage in self-harm or attempt suicide." *Id.* ¶ 29.

The self-harm and suicide attempts were numerous. In May 2023, Mx. Cornwell banged their head against the wall, among other self-harm. *Id.* ¶ 30. In June 2023, Mx. Cornwell was caught trying to smuggle a bottle of Visine into their cell. *Id.* ¶ 31. It is well known that Visine, when ingested orally, is a potentially lethal substance. *Id.* Later that June, Mx. Cornwell attempted self-castration. *Id.* ¶ 32. In July, they engaged in self-harm again, and was placed on self-harm observation status. *Id.* ¶ 33. Over the next months, Mx. Cornwell repeatedly self-harmed, culminating in a November 2023 suicide attempt requiring hospitalization. *Id.* ¶ 34.

Mx. Cornwell was prescribed medications to control suicidal urges. *See id.* ¶ 36. Mx. Cornwell reported that one of those medications, Naltrexone, helped to reduce those urges, but Naltrexone was removed from the formulary and Mx. Cornwell stopped receiving it in December 2023. *Id.* Mx. Cornwell was prescribed Abilify, another such medication, but it too was off-formulary and would not be approved for Mx. Cornwell until January 29, 2024, two days after Mx. Cornwell had died. *Id.* ¶ 42.

### *January 24.*

On January 24, 2024, Mx. Cornwell mutilated their forearms and scrotum so severely that they began to bleed out. *Id.* ¶ 37. They then underwent a mental health evaluation by a Centurion mental health counselor and reported, "I'm not okay," "I'm willing to die," and "I don't care if I die. There's nothing that can numb the pain." *Id.* ¶ 38. Mx. Cornwell also said, "I'm tired of life, it's a heavy burden." *Id.* ¶ 39. Mx. Cornwell was covered in blood and was sobbing at the visit. *Id.* These symptoms and statements were documented in their records. *Id.*

A second mental health professional, Defendant Jeremy Shiver (Centurion's Mental Health Director), saw Mx. Cornwell that day. *Id.* ¶ 40. Mx. Cornwell told Dr. Shiver that the self-harm lacerations resulted from scratching with fingernails, but Dr. Shiver reported that this was doubtful because the laceration marks were "notably precise and clean." *Id.* This indicated Mx. Cornwell had access to a cutting device, but Dr. Shiver did not follow up to remove it. *Id.* ¶¶ 41, 83. The Complaint also alleges Shiver did not ensure Mx. Cornwell saw a physician after the premature return, *id.* ¶¶ 83, 103, and that Shiver failed to ensure Mx. Cornwell was receiving appropriate psychotropic medication at the time, *id.* ¶ 83.

### *January 25-27.*

Mx. Cornwell was taken to the prison's infirmary on January 25 for the January 24 injuries. *Id.* ¶ 45. Those injuries were so severe that on January 26

Mx. Cornwell was transported to an outside hospital, the deep lacerations held together only by sutures. *Id.* ¶ 46. The hospital diagnosed anemia from acute blood loss. *Id.* ¶ 46. Providers at the hospital assessed that Mx. Cornwell should spend "at least 2 nights" at the hospital. *Id.* ¶ 47. However, shortly after 10:00 a.m. on January 27, Mx. Cornwell was discharged from the hospital and taken back to the prison. *Id.* ¶ 47. The complaint alleges this premature discharge resulted from the intervention of Centurion's agents. *Id.* ¶ 48.

***January 27.***

Mx. Cornwell was returned to the prison at 11:37 a.m. on January 27. *Id.* Medical staff at the prison bandaged Mx. Cornwell's cut wounds, and Defendant Sheila Melvin, a Centurion nurse, *id.* ¶ 17, directed that Mx. Cornwell be returned to a prison cell. *Id.* ¶ 51. Mx. Cornwell was placed in a cell alone, *id.* ¶ 53, but despite the recent self-cutting severe enough to cause anemia, Mx. Cornwell was placed only on a 15-minute watch. *Id.* ¶ 52.

Before 1:00 p.m., Mx. Cornwell engaged in self-harm again, *id.* ¶ 54, ripping open the bandaged wounds from the January 24 self-mutilation, *id.* ¶ 59, and bleeding so profusely that a prison guard was able to observe blood in the cell from the cell-front door during one of the 15-minute checks. *Id.* ¶ 55. After that guard (Defendant Boatwright) radioed for assistance, additional guards, Monroe,

Graham, and Trainer, arrived at the cell. *Id.* ¶ 55. They found that Mx. Cornwell was not moving and was unresponsive. *Id.*

Graham and Trainer took Mx. Cornwell to the prison's medical unit. *Id.* ¶ 56. There, Nurse Tichenor examined Mx. Cornwell, with nurses Price, Melvin, and Jones present. *Id.* ¶ 57. Mx. Cornwell had come to, and informed those present, including guards Trainer and Graham, that Mx. Cornwell would continue self-harming if returned to a prison cell. *Id.* ¶¶ 58, 63. Mx. Cornwell's blood pressure was taken, and it measured 93/60, which is considered borderline hypotensive; the complaint alleges that this was caused by the loss of blood that occurred by Mx. Cornwell's reopening of the self-harm wounds, reducing the amount of blood circulating in Mx. Cornwell's body. *Id.* ¶ 59.

The complaint alleges that with this knowledge, Nurses Jones, Melvin, Tichenor, and Price should have taken steps to ensure Mx. Cornwell received emergency medical attention for the blood loss. *Id.* ¶ 60. Instead, they ordered that Mx. Cornwell be taken back to a prison cell, with instructions for a follow-up evaluation in six hours. *Id.* ¶ 61. Such an instruction was outside of the scope of practice of nurse Melvin, the advanced practical nurse in charge. *Id.* ¶ 62. No doctor ever saw Mx. Cornwell, as none was on-site at the prison. *Id.* ¶ 62.

Despite hearing Mx. Cornwell say they would keep harming themselves if returned to a cell, *id.* ¶¶ 58, 63, guards Trainer and Graham took Mx. Cornwell

back to a cell. *Id.* ¶ 63. No one who heard that warning changed the 15-minute checks, though those checks had already failed to prevent Mx. Cornwell's self-harm. *See id.* ¶ 64 (noting post-infirmary 15-minute checks).

Shortly thereafter, on another 15-minute check, prison guard Boatwright again looked into the cell and saw blood around Mx. Cornwell. *Id.* ¶ 64. Boatwright asked Mx. Cornwell what they were doing, to which Mx. Cornwell responded by biting at their forearm, reopening the sutured wound, and saying, "what do you think I'm doing?" *Id.*

Boatwright radioed for assistance, and guards Trainer and Graham, responded, along with Defendant Johnson, a nurse, who observed Mx. Cornwell in the cell. *Id.* ¶¶ 65-66. Trainer and Graham took Mx. Cornwell back to the prison's medical unit, accompanied by Nurse Johnson, *id.* ¶¶ 66-67; on the way there Mx. Cornwell defecated on the floor. *Id.* ¶ 66.

Once back in the infirmary, nursing staff, including defendants Johnson, Winfree, Melvin, and Price simply re-dressed Mx. Cornwell's wounds. *Id.* ¶ 68. They did not have Mx. Cornwell seen by a doctor or sent to the hospital; instead they ordered that Mx. Cornwell be returned to a prison cell. *Id.* Prison guards Monroe and Trainer escorted Mx. Cornwell back to the cell. *Id.* ¶¶ 68-69. It was about 2:30 p.m. *Id.* ¶ 69.

Around this time, Nurse Tichenor issued a staff referral for Mx. Cornwell to be seen by a mental health provider. *Id.* ¶ 70. But the referral was non-emergent. *See id.* Indeed, though every nurse who saw Mx. Cornwell that day knew of the self-harm, the resulting blood loss and anemia, and Mx. Cornwell's repeated promises to keep cutting, neither Nurse Tichenor nor any of the other medical defendants sought an emergency referral for Mx. Cornwell—either for mental health care or for hospitalization to address the danger posed by the additional blood loss. *Id.* ¶ 70. Nor did any of the medical staff who saw Mx. Cornwell on January 27 instruct the prison's security staff to subject Mx. Cornwell to additional monitoring or to take any other steps to prevent yet more self-harm and more resulting blood loss. *Id.*

Around 3:30 p.m., an orderly looked in on Mx. Cornwell's cell and saw Mx. Cornwell in a pool of blood. *Id.* ¶¶ 71-72, 74. When officers came into the cell, blood continued to flow from Mx. Cornwell's arm. *Id.* ¶ 76. Guards took Mx. Cornwell back to the prison's medical unit in a wheelchair, where nurses Winfree, Price and Tichenor observed that Mx. Cornwell was covered in feces and blood. *Id.* ¶¶ 79, 80.

Despite Mx. Cornwell's condition, nursing staff did not summon EMS or escalate care in any way. By 4:00 p.m., Winfree had issued another mental health referral for Mx. Cornwell, *id.* ¶ 81, but not a referral to the ER, *id.* Meanwhile,

nurses Price and Melvin conferred, *id.* ¶ 82, and Nurse Melvin instructed staff to take Mx. Cornwell back to the prison cell. *Id.* ¶ 84. Making this determination was outside of Melvin's scope of practice, *id.* ¶ 82, but the nurses in the infirmary, including Nurses Price and Johnson, *id.* ¶ 85, proceeded to carry out the order. *Id.*

When Melvin gave this order, Mx. Cornwell was on their deathbed. Price, Johnson, Tichenor, and Winfree tried to take Mx. Cornwell's vitals before the return but could not find a pulse. *Id.* ¶ 85. They began chest compressions; only then did Price call 911. *Id.* Less than an hour later, Mx. Cornwell was pronounced dead. *Id.* ¶ 86. The medical examiner labeled the cause of death suicide, caused by anemia secondary to blood loss from self-inflicted wounds. *Id.* ¶ 87.

***Monell allegations against Centurion.***

The Complaint alleges that the failure to provide Mx. Cornwell with adequate medical care and prevent Mx. Cornwell's death were the proximate result of the policies and practices of defendant Centurion of Florida, which employed the medical staff who saw Mx. Cornwell at the prison. ECF 1 ¶ 119.

The complaint alleges that Centurion of Florida is operated as an enterprise with multiple corporate affiliates across multiple states, *see id.* ¶¶ 132-33, which together form one of the largest correctional healthcare companies in the nation, *id.* ¶ 133, and which Plaintiff refers to as a single entity, including the owner of the various Centurion entities, the Sullivan Brothers Family of companies. *Id.* ¶ 13.

The complaint alleges that Centurion and its affiliates, as a practice, make low bids on contracts with correction administrators, *id.* ¶¶ 132, 134; then, once Centurion (Centurion of Florida and its affiliates) obtains the contracts, it provides, as a common practice, cheap, substandard services in order to stay within the confines of the low contract bids. *Id.* ¶ 132. Thus, Centurion "discourages practitioners from referring patients to the hospital, intervenes to ensure that patients are returned from the hospital to the correctional facility promptly, and attempts to handle emergencies in-house, even when such care is beyond the capabilities of its practitioners." *Id.* ¶ 129. At the same time, the Complaint alleges, Centurion staffs facilities with nurses instead of doctors, and permits them to operate outside their scope of practice, with the result that prisoners under Centurion's care are systematically deprived of access to doctors to assess their symptoms and determine their medical needs. *Id.* ¶¶ 129-30. The complaint further alleges that Centurion engages in a number of practices that endanger its patients, such as disregarding serious symptoms, failure to create sensible treatment plans or ensure continuity of care, and multiple problems discussed *supra*. *Id.* ¶ 126. Centurion additionally understaffs its facilities to dangerous levels. *Id.* ¶ 137.

The proximate result of these deficiencies, the complaint alleges, are numerous cases in which Centurion and its affiliated companies, in Florida and

across the country, have provided markedly inadequate care, with catastrophic results. *See, e.g.*, *id.* ¶ 135. The Complaint lists multiple examples:

- A prisoner in Tennessee died after suffering a stroke because Centurion employees refused to send him to a medical provider and kept him in the prison infirmary instead. *Id.* ¶ 131.
- A prisoner in New Mexico committed suicide after Centurion employees refused to refer him for mental healthcare. *Id.* ¶ 131.
- Another prisoner in New Mexico committed suicide after Centurion employees reduced his psychotropic medications to save money. *Id.* ¶ 131.
- Another prisoner in New Mexico suffered permanent spine damage because Centurion employees refused to refer him for outside medical care. *Id.* ¶ 131.
- In 2023, an inmate who had been pepper sprayed by guards died after Centurion employees ignored his reports that he could not breathe. *Id.* ¶ 136.
- When a Kansas prisoner presented with a grapefruit-size hernia and other serious conditions, Centurion employees "treated" him only with Tylenol. *Id.* ¶ 139.
- In New Mexico, a prisoner developed cirrhosis after chronically being denied hepatitis treatment while under Centurion's care. *Id.* ¶ 143.
- A New Mexico prisoner became unable to walk after Centurion staff ignored his repeated reports of serious back pain. *Id.* ¶ 144.

Beyond these specific examples, the Complaint alleges multiple findings of systematically unconstitutional care by Centurion:

- A federal court in Arizona found that Centurion systematically subjected Arizona's prison system to a shortage of nurses, nurse practitioners, and doctors, calling staffing "woefully insufficient." *Id.* ¶ 142.
- More than 20 Centurion nurses in Missouri expressed concern about quality and safety at Centurion facilities, including 11 nurses who stated

that they were required to carry unsafe caseloads, including single nurses charged with covering an entire prison wing. *Id.* ¶ 137.

- The State of Missouri fined Centurion $3 million for failing to meet the standards outlined in its contract. *Id.* ¶ 138.
- Between 2021 to 2022, a Centurion affiliate was subject to approximately 5,000 discrete fines totaling almost a million dollars for failing to meet contract standards. *Id.* ¶ 141

Plaintiff alleges that these practices are evident in Centurion's treatment of prisoners in Florida as well:

- A Centurion doctor "monitored" a prisoner's advancing prostate cancer until it became metastatic, even though the prisoner had already been approved to see an outside specialist. *Id.* ¶ 145.
- Curtis Dettmann, a young prisoner recovering from a routine surgery, showed signs of a common post-surgical infection over several days. Even though the prisoner became wheelchair bound and his condition deteriorated dramatically as the infection caused him to become septic, Centurion medical staff discharged him from the infirmary to the general population—where he died of the infection a few hours later. *Id.* ¶ 146. Centurion received notice of this case in the lawsuit over Mr. Dettmann's death, *McCrimmon v. Centurion of Florida*. *Id*
- The complaint alleges that after an outside specialist assessed a prisoner as requiring prompt surgery for a basal cell carcinoma, Centurion medical staff failed to return the prisoner's blood work and failed to refer him to the surgeon *for a year*. *Id.* ¶ 147.

The foregoing widespread practices, alleges the complaint, bear striking similarity to the care, or lack thereof, provided to Mx. Cornwell considering their obvious need first for medication; then for lack of intervention to identify the source of the device Mx. Cornwell was using to commit self-harm; then for the failure of multiple Centurion personnel to provide adequate care; *removing* Mx. Cornwell

from the care of outside physicians treating Mx. Cornwell's anemia; and providing no adequate care even though Mx. Cornwell, who was known to be suicidal and said they were suicidal to staff, repeatedly ripped open their wounds and bled to death over the day on January 27. *Id.* ¶¶ 148-158.

## STANDARD OF REVIEW

Under Rule 12(b)(6), a complaint must provide "more than . . . a formulaic recitation of the elements of a cause of action," but it "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). The Court must accept all well-pleaded facts as true, drawing all reasonable inferences in Plaintiff's favor. *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1534 (11th Cir. 1994). So construed, the complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) (quotation omitted). This "is not akin to a 'probability requirement'"; the plaintiff need only allege "'enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

All defendants in this matter have moved to dismiss the claims against them, *see* ECF 26, ECF 28. Plaintiff addresses the defendants' arguments as follows:

first the Medical Defendants (Shiver, Tichenor, Price, Melvin, Winfree, Johnson, Jones); then the Guard Defendants (Boatwright, Monroe, Trainer); then Centurion. With the limited exception set out herein, dismissal is not warranted.

## I. The Medical Defendants: Shiver, Tichenor, Price, Melvin, Winfree, Johnson, Jones.

The Medical Defendants seek dismissal. ECF 28 at 10-14. They offer a cursory recounting of Mx. Cornwell's course over January 24-27, note that they provided *some* care, then contend that any deficiencies at most reflect negligence, not deliberate indifference. *Id.* This argument ignores many of Plaintiff's allegations and misunderstands the deliberate indifference standard.

To establish liability on an Eighth Amendment deliberate indifference claim, a plaintiff must satisfy an objective and a subjective element. The plaintiff must first "demonstrate, as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024). Second, the plaintiff must demonstrate that the defendant exhibited "subjective recklessness as used in the criminal law," which means simply that the "defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm" from that medical condition. *Id.* at 1253 (quotations omitted).

This standard applies to deliberate indifference to medical needs and to the risk of suicide alike. Prison officials may be held liable for an inmate's suicide if

they "displayed deliberate indifference to the prisoner's taking of his own life." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) (quotation omitted). While "the mere opportunity for suicide, without more," is "insufficient to impose liability" on prison officials, *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008), a prison official is deliberately indifferent when they "disregard a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." *Cook*, 402 F.3d at 1115 (quotation omitted). That standard is satisfied where the official is "subjectively aware that the *combination* of the **[1]** prisoner's suicidal tendencies and **[2]** the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide." *Gish*, 516 F.3d at 955 (emphasis original; brackets added). "Whether a prison official had the requisite knowledge" of such a risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk *from the very fact that the risk was obvious*." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (emphasis added). This does not require certainty that the harm would occur: "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed

to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

Finally, a deliberate indifference claim cannot lie where the prison official "responded reasonably to the risk" of which they were actually aware. *Id.* at 825. But taking *some* measure is not enough; the response must be, in *Farmer*'s words, reasonable. Thus "even when a prisoner receives some medical care, a plaintiff states a claim for deliberate indifference if he alleges the care he received was 'so cursory as to amount to no treatment at all,' was grossly inadequate, or was guided by a 'decision to take an easier but less efficacious course of treatment.'" *McCrimmon v. Centurion of Fla., LLC*, No. 3:20-CV-36-BJD-JRK, 2021 WL 424348, *3 (M.D. Fla. Feb. 8, 2021) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

*McElligott* provides an apt application of this principle. *McElligott* reversed an entry of summary judgment in favor of two medical providers who knew the plaintiff's medical condition was worsening but never attempted a diagnosis the condition then prescribed medications that were ineffective and which "did nothing to treat [his] deteriorating state." *McElligott*, 182 F.3d at 1257, 1259. In such a circumstance, *McElligott* held, "A jury could infer deliberate indifference from the fact that [Dr. Foley] knew the extent of [Elmore's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to

improve [Elmore's] condition," as well as the delay in providing that care. *Id.* at 1257-58.

* * *

These basic principles are fatal to the Medical Defendants' motion. As an initial matter, the Medical Defendants all knew, even before January 24, that Mx. Cornwell was suicidal—or at least that Mx. Cornwell's sustained pattern of severe self-mutilation could prove fatal through blood loss. Then, Mx. Cornwell cut their arm and scrotum deeply on January 24—injuries so severe they would eventually lead to Mx. Cornwell's death—and then told mental health staff that they (Mx. Cornwell) were suicidal and wanted to die. *Id.* ¶¶ 37-38. The first half of *Gish*'s two-part test is satisfied as applied to all Medical Defendants: from January 24 onward, Mx. Cornwell's "suicidal tendencies" would have been amply obvious to each of the Medical Defendants in the three days Mx. Cornwell had left to live. *Gish*, 516 F.3d at 955.

***Shiver.*** The Complaint alleges that Defendant Shiver—aware of Mx. Cornwell's extreme suicidality—saw Mx. Cornwell on January 25, at which time he recognized that the deep lacerations meant Mx. Cornwell had used, and still had access to, a cutting device capable of serious self-harm. Shiver, in other words, was not only aware of Mx. Cornwell's "suicidal tendencies" that corresponded with their demonstrated willingness to follow through on those tendencies, but also

that suicide would be "feasible" should Mx. Cornwell be allowed back into the prison surroundings where the device was evidently accessible. This satisfies *Gish*'s second criteria, that severe self-harm, and the resulting risk of death, was "feasible." *Gish*, 516 F.3d at 955. Yet, the Complaint alleges, Shiver took no steps to interdict Mx. Cornwell's access to the implement, by warning others or otherwise. ECF 1 ¶ 41. The Medical Defendants' brief addresses none of these allegations in any form; instead, to the extent it refers to Shiver it all, it indicates merely that he had contact with Mx. Cornwell on a "brief occasion[.]" ECF 28 at 11. That in no way negates Shiver's failure to interdict the suicide implement he inferred Mx. Cornwell must possess.

Plaintiff also alleges that when Mx. Cornwell was discharged from the hospital on the morning of January 27, Shiver did nothing to ensure Mx. Cornwell was assessed by a prison physician or received adequate mental healthcare. ECF 1 ¶ 83. Given Mx. Cornwell's emergent condition—anemia from blood loss—and stated intent to die, ensuring such care was critical. Yet Shiver did nothing, and the defendants' memorandum says nothing about this allegation.

***Tichenor, Price, Melvin, Winfree, Johnson, Jones***. These defendants, all nurses who encountered Mx. Cornwell on January 27, also seek dismissal. *See* ECF 28 at 11-14. Their arguments do not withstand scrutiny. Mx. Cornwell was returned from the hospital at 11:37 a.m. on January 27, against the doctors' advice

and still anemic from the January 24 blood loss. Mx. Cornwell remained actively suicidal, having told a mental health evaluator after that mutilation that there was "nothing that can numb the pain" and that they (Mx. Cornwell) were "willing to die." Any medical professional encountering Mx. Cornwell after Mx. Cornwell's return from the hospital would have been aware of Mx. Cornwell's strong "suicidal tendencies," satisfying *Gish*'s first criteria for liability. 516 F.3d at 955.

*Gish*'s second criteria was satisfied as well: Mx. Cornwell's January 24 lacerations had led to so much blood loss as to cause acute anemia; all Mx. Cornwell had to do to complete the suicide was to rip open those wounds again, *see* ECF 1 ¶ 46. Indeed, this fact was so obvious that a *guard* suggested, far too late, that Mx. Cornwell be placed in five-point restraints to prevent Mx. Cornwell from re-opening the sutures again, *see id.* ¶ 81. In *Gish*'s framing, "the feasibility of suicide in the context of [Mx. Cornwell]'s surroundings" was obvious. *Gish*, 516 F.3d at 955. All Mx. Cornwell needed to commit suicide was to be left unsupervised in a cell to rip open the wounds and bleed to death.

That seclusion—with no protections—is exactly what the nurse defendants gave Mx. Cornwell. When Mx. Cornwell returned from the hospital, Defendant Melvin ordered Mx. Cornwell returned to a prison cell on a 15-minute watch—ample time to rip open their lacerations and bleed. ECF 1 ¶¶ 51-53.

It was easy to see at 11:37 a.m. that this setup gave Mx. Cornwell the opportunity to try again, and Mx. Cornwell made it unmistakable at 1:00 p.m., reopening the lacerations and bleeding so freely that a guard saw blood during a cell check. *Id.* ¶¶ 54-55. Nurses Tichenor, Price, Johnson, Melvin, and Jones were in the infirmary when Mx. Cornwell was brought back. They saw that Mx. Cornwell had lost enough blood to be hypotensive, and heard Mx. Cornwell promise to keep self-harming if returned to the cell. Did any of these nursing defendants change course? No. They bandaged Mx. Cornwell's wounds again, ordered no changes to Mx. Cornwell's monitoring or recommended restraints (to say nothing of sending Mx. Cornwell back to the hospital)—and *had Mx. Cornwell sent back to the cell* with no additional precautions. ECF 1 ¶¶ 56-64. At the pleading stage it is reasonable to infer that each nurse was subjectively aware that Mx. Cornwell was suicidal, that Mx. Cornwell's anemia and fresh blood loss made the danger grave, and that returning Mx. Cornwell to an unmonitored, unrestrained cell supplied the opportunity to complete a suicide. Yet every nurse defendant allowed exactly that.

After being sent back to their cell again, Mx. Cornwell ripped open their wounds again, and again bled out, around 3:30 p.m. Mx. Cornwell was brought back to the infirmary near death, and was again seen there by nurses Winfree, Price, Tichenor, Melvin, and Johnson. ECF 1 ¶¶ 71-84. Mx. Cornwell appeared

gravely ill, yet none of the nurses—despite knowing of the ongoing blood loss—called 911. Instead they bandaged Mx. Cornwell and prepared to *send Mx. Cornwell back to the cell again*. *Id.* ¶ 85. They did not accomplish this only because Mx. Cornwell's heart stopped beating.

The defendants do not grapple with these allegations, which are set out plainly in the complaint. In their defense they say instead that each of the nursing defendants "responded to [Mx. Cornwell]'s self-harm attempts by addressing their wounds, ordering further monitoring, and/or submitting requests for Mx [Cornwell] to be seen and evaluated by a higher level of mental health care." ECF 28 at 14. Those responses are not defenses to liability in this case, because a prison official's response must be "reasonable." As the Court explained in *McElligott*, where it can be inferred that a prison official knows of a risk or serious condition, the official is deliberately indifferent when they "knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the prisoner's] condition" or the risk they faced. 182 F.3d at 1257-58. The Complaint's allegations amply support that inference here, as the nurses repeatedly sent Mx. Cornwell back to their cell under 15-minute watch, despite Mx. Cornwell's evident ability to continue self-mutilating under that protocol. Nor is it a defense that a nurse submitted a routine mental health referral that afternoon, as that referral was not noted to be emergent despite the obvious urgency of Mx.

Cornwell's medical condition. With Mx. Cornwell actively dying in front of them, a routine referral was a delay in care that is itself deliberate indifference. *Id.*

The motion to dismiss Tichenor, Price, Melvin, Winfree, Johnson, Jones should be denied.

## II. The Guard Defendants: Boatwright, Monroe, Trainer.

The Guard Defendants—Boatwright, Monroe, and Trainer—move to dismiss the claims against them and, in the alternative, assert qualified immunity. ECF 26. Plaintiff does not oppose dismissal of the claims against Officer Boatwright on the allegations as presently pleaded, asking only that such dismissal be entered without prejudice. Plaintiff does oppose dismissal of the claims against Officers Monroe and Trainer, who, unlike Boatwright, were present in the infirmary as medical staff repeatedly cleared Mx. Cornwell to be returned to a cell to bleed, and who personally watched the danger mount across the day.

***Boatwright.*** On the allegations as presently pleaded, Boatwright's involvement was limited. During cell-front security checks, she twice discovered that Mx. Cornwell had self-harmed, observed blood in the cell, and radioed for assistance. ECF 1 ¶¶ 55, 64. She is not alleged to have entered the infirmary, to have heard the medical staff's decisions to return Mx. Cornwell to the cell, or to have known that Mx. Cornwell was being returned to the cell notwithstanding the

escalating danger. On these allegations alone, Plaintiff does not oppose dismissal of the claims against Boatwright.

That dismissal should, however, be without prejudice. Plaintiff's claims against the remaining defendants will proceed into discovery, which may reveal that Boatwright knew more than the present record reflects—for example, that she was present for, or otherwise aware of, the medical staff's repeated decisions to send Mx. Cornwell back to the cell. Because leave to amend should be freely given where facts developed in discovery would support a claim, the Court should dismiss the claims against Boatwright without prejudice. *See* Fed. R. Civ. P. 15(a)(2).

***Monroe and Trainer.*** Officers Monroe and Trainer stand on very different footing. To be sure, "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Dunn v. Hart*, No. 5:13-CV-131, 2016 WL 5661058, at *9 (S.D. Ga. Sept. 29, 2016) (quoting *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). For that reason, "in the absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of

deliberate indifference." *Kelly v. Ambroski*, 97 F. Supp. 3d 1320, 1343 (N.D. Ala. 2015).

But that deference is not limitless. When "it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment," correctional officers may not avoid liability by blindly deferring to medical staff. *Truschke v. Chaney*, No. 5:17-cv-93, 2018 WL 814579, at *5 (S.D. Ga. Feb. 9, 2018) (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006)).

Such cases are "unusual," *id.*, but this one qualifies. Unlike Boatwright, Officers Monroe and Trainer were present throughout the day as the same lethal cycle repeated itself in front of them: Mx. Cornwell ripped open sutured wounds, bled severely, was carried to the infirmary, was patched up, and was sent back—and Monroe and Trainer, watching, would have recognized that thetreatment was no answer to the danger. With no precautions ordered by nurses, a layperson would predict that once back in the cell Mx. Cornwell would rip into the bandages, re-open the wounds, and bleed out on the cell floor. And a layperson would know that bleeding out is a serious medical condition creating a risk of death. Indeed, it was another correctional officer, not a nurse, who later recognized the need to place Mx. Cornwell in five-point restraints to stop the self-harm. ECF 1 ¶ 81. Monroe and Trainer had reason to believe that the nurses were not taking the steps

required to stop Mx. Cornwell's ongoing suicide attempt, yet they did nothing to protect them from their obvious suicidal intent.

***Qualified immunity.*** The Guard Defendants alternatively invoke qualified immunity. The Complaint, however, alleges the violation of a clearly established right. A plaintiff may show that a right was clearly established through, among other means, "a materially similar case" or conduct so obviously unconstitutional "that prior case law is unnecessary." *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1261 (11th Cir. 2025) (quotation omitted).

In *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262 (11th Cir. 2005), the court held that a jail official is deliberately indifferent where the official knew the inmate had previously attempted suicide, the inmate told the official he was suicidal, and the official "did nothing" in response. *Id.* at 1270. The court characterized that officer's conduct as a "complete failure to take any action," includinga failure to communicate the risk to other staff, to remove dangerous items or move the inmate to a safe cell, to return him for treatment and observation, or to implement any suicide-prevention measures. *Id.* Here, Monroe and Trainer knew Mx. Cornwell had just been hospitalized for self-inflicted blood loss, knew Mx. Cornwell was announcing an intent to keep cutting, and watched the danger recur three times, yet took no step of their own—not restraints, not a demand that medical staff escalate, not additional monitoring—to interrupt it.

A recent decision applying this settled law confirms the point on closely analogous facts. In *Smith v. Tracey*, the court denied qualified immunity to detention officers who learned of a detainee's suicide risk, heard him threaten suicide, and took no "affirmative steps to address the suicide risk," explaining that *Snow* "clearly establishes that an officer who knows of an inmate's suicide threat yet fails to take any steps to prevent the inmate from committing suicide is deliberately indifferent." No. 1:24-cv-5158-TWT, 2026 WL 2667535, at *5 (N.D. Ga. Sept. 10, 2026). The same rule governs here and forecloses qualified immunity at the pleading stage.

The motion to dismiss Monroe and Trainer should be denied. The claims against Boatwright should be dismissed without prejudice.

## III. Centurion.

Plaintiff alleges that Centurion has widespread practices of providing inadequate care, particularly in ignoring the needs of patients, minimizing outside referrals to outside providers, and providing inadequate staffing with staff who practice outside their scope yet do not escalate care. Numerous cases across the country and in Florida, summarized above, show Centurion staff providing patently inadequate care to catastrophic effect.

Centurion does not engage these allegations in detail, offering only undeveloped general arguments.

***First***, Centurion argues that the cases Plaintiff cites are not sufficiently similar to the care received by Mx. Cornwell. *See* ECF 28 at 7-8. In support, Centurion says only that the complaint does not identify other "similar prior inmate suicides," without elaboration. *See id.* at 9 (emphasis original).

This argument misunderstands what *Monell* requires. Mx. Cornwell's suicide was bound up entirely with the failure of Centurion's employees to provide and secure adequate medical care. Plaintiff's *Monell* theory is not that Centurion has a custom of providing inadequate suicide prevention care. Rather, Plaintiff alleges the company has a custom pursuant to which staff disregard objectively serious symptoms; frequently refuse to send patients to necessary outside care; fail to develop sensible treatment plans; and the like. *See* ECF 1 ¶ 126. None of those theories turn on the provision of care addressed to a suicidal prisoner, and they do not have to. Indeed, multiple courts across the country have made this clear. *See, e.g.*, *Davies v. Israel*, 342 F. Supp. 3d 1302, 1307 (S.D. Fla. 2018) (holding that where a *Monell* theory is grounded in a failure to obtain medical care for detainees suffering medical conditions, using examples from different conditions, including "sepsis, pneumonia, starvation, hemorrhaging, etc.," were sufficient to plead a widespread practice); *Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278, 2022 WL 4290528, at *53 (D. Md. Sept. 16, 2022) (finding similar on summary judgment with respect to factual differences in other medical incidents identified

by plaintiff); *Boyer v. Advanced Corr. Healthcare, Inc.*, No. 20-CV-1123, 2023 WL 3978147, at *7 (W.D. Wis. June 13, 2023) (holding that under the plaintiff's *Monell* theory, "it makes no difference whether the [other] inmate's need for outside emergency care or treatment in these other cases was the result of a cardiac issue or some other medical condition, or even if it resulted in a similar injury."). Centurion's "similarity" argument is unavailing.

***Second***, Centurion argues that in making its widespread practice assessment the Court should *only* consider cases from Florida. ECF 28 at 9. The complaint, of course, *does* cite multiple cases from Florida, including the chillingly similar indifference shown by Centurion medical staff to Curtis Dettmann, *see* ECF 1 ¶ 146. But all the same, Plaintiff alleges that Centurion is a part of a national family of affiliated companies with a single owner, which operates those companies pursuant to a common business model and common practices. *See id.* ¶¶ 13, 132-35. Corporate operators should not be permitted to defeat *Monell* liability by subdividing themselves in this manner, and indeed multiple federal district courts in Florida have considered Centurion's practices in Florida and in other states when assessing *Monell* allegations against it. *See, e.g.*, *Cineus v. Fla. Dep't of Corr.*, No. 8:21-CV-1659-MSS-SPF, 2022 WL 4448599, at *5–6 (M.D. Fla. Sept. 23, 2022) (assessing Centurion practices via "subsidiaries" in Florida, New Mexico, and Tennessee). The court in *Herr v. Armor Correctional Health*

*Services, Inc.*, No. 6:19-cv-394, 2019 WL 12021672 (M.D. Fla. Sept. 9, 2019), reached a similar conclusion with respect to another correctional medical vendor, holding that incidents of inadequate care by a private jail healthcare vendor "around the country" supported a claim that the vendor "has a policy or custom of repeated delayed or denied medical care that directly resulted in the constitutional violation and Mr. Herr's death." *Id.* at *5. Centurion offers no reason for the Court to close its eyes to its settled national practices here.

***Third***, Centurion argues Plaintiff's allegations that Centurion has a practice of discouraging outside referrals or understaffing its facilities with qualified medical personnel present a "causation" problem because at other times Mx. Cornwell was seen by doctors, and Mx. Cornwell was, on January 25, sent to the hospital. ECF 28 at 9-10. This argument misunderstands the Complaint's allegations and the requirements of *Monell*. The widespread-practice doctrine under *Monell* does not require that unconstitutional conduct be uniform; only that it be widespread. And indeed, Plaintiff does not allege that Centurion *never* sends prisoners to outside hospitals or has *no* physicians on staff. It is, rather, that Centurion "discourages" outside referrals even when they are needed, *see, e.g.*, ECF 1 ¶ 129 (indeed Mx. Cornwell's referral to the hospital on January 25, and the premature discharge back to the prison, support this), and that Centurion keeps "very few" doctors on its payroll relative to the number that is clinically indicated.

*Id.* ¶ 130. Plaintiff's allegations that Centurion has widespread practices of providing inadequate care are not undone by the few occasions where care rises to par. Centurion's motion to dismiss should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court deny the motion to dismiss filed by Defendants Monroe and Trainer (ECF 26) and the motion to dismiss filed by the Centurion Defendants (ECF 28) in their entirety, and dismiss the claims against Defendant Boatwright without prejudice.

Respectfully submitted,

/s/ *Sam Harton*

Sam A. Harton
ROMANUCCI & BLANDIN
321 n Clark Street, STE 900
Chicago, IL 60654
312-253-8509
sharton@rblaw.net

James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
Tel. (404) 458-7283
james@slater.legal
Attorneys for Plaintiff Stacie Laviano

**<u>Local Rule 7.1(F) Certification</u>**

Pursuant to Local Rule 7.1(F), I hereby certify that the above document contains fewer than 7,000 words, inclusive of headings, footnotes, and quotations, but exclusive of the case style, signature block and certificates.

By: *<u>/s/ Sam Harton</u>*
Sam Harton