**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**STACIE LAVIANO,** as Personal Representative of the Estate of Trey Allyn Cornwell, and on behalf of the estate and survivors,

**Plaintiff**,

**v.** **Case No. 3:26-cv-3970-TKW-ZCB**

**CENTURION OF FLORIDA, LLC, et al.**,

**Defendants**.
____________________________________/

## ORDER ON MOTIONS TO DISMISS

This case is before the Court based on motions to dismiss filed by the Officer Defendants[1] (Doc. 26) and the Centurion Defendants[2] (Doc. 28). Upon due consideration of the motions, Plaintiff's response in opposition (Doc. 34), and the complaint (Doc. 1), the Court finds that the Officer Defendants' motion is due to be granted and that the Centurion Defendants' motion is due to be granted in part and denied in part.

---

[1] Defendants Boatwright, Monroe, and Trainer.

[2] Defendant Centurion of Florida, LLC (Centurion) and Defendants Price, Melvin, Winfree, Shiver, Johnson, Tichenor, and Jones (the Medical Defendants).

## Facts

This case arises out of the suicide death of inmate Trey Cornwell[3] at the Santa Rosa Correctional Institution (SRCI) on January 27, 2024. The plaintiff is the personal representative of Cornwell's estate, and the defendants are the company responsible for providing inmate medical and mental health care at SRCI (Centurion),[4] three SRCI correctional officers (the Officer Defendants), and seven Centurion employees who provided medical or mental health care to inmates at SRCI (the Medical Defendants).

Cornwell entered FDOC custody in November 2022.[5] Two months later, in January 2023, Cornwell was admitted to a crisis stabilization unit for repeated self-

---

[3] The complaint alleges that Cornwell "had gender dysphoria and went by the name Michelle, using 'they/them' pronouns and the honorific 'Mx.'" Even if that is true, it does not change the fact that Cornwell was a biological male. Thus, when referring to Cornwell, the Court will use his last name and he/him pronouns rather than the grammatically incorrect they/them pronouns and the made-up "Mx." honorific. *See West Virginia v. B.P.J. by Jackson*, 609 U.S. 958, 995 (2026) (Thomas, J., concurring) ("Men and boys with gender dysphoria are not women or girls, even if they believe that they are. Sex is an immutable 'biological' characteristic; it is binary; and 'man' and 'woman,' 'boy' and 'girl,' are the terms that correspond to adults and children of each sex. To use language to obscure reality … is to lie to the public and cease to treat our fellow citizens 'as equal[s].'") (internal citation omitted and alteration in original).

[4] The Florida Department of Corrections (FDOC) contracted with Centurion to provide medical services at correctional institutions across the state, including SRCI.

[5] FDOC's website reflects that Cornwell was sentenced to four years in prison for "agg[ravated] battery intending harm," but state court records reflect that Cornwell was originally placed on probation for that offense and that he was not sentenced to prison for that offense until he violated probation by absconding from a residential substance abuse treatment program. The state court records for the aggravated battery offense reflect that the offense occurred in December 2019 when Cornwell was at the state psychiatric hospital and he pushed, hit, and kicked the victim causing him to bleed from the head. Other state court records reflect that Cornwell has an extensive criminal history—which dates back to at least 2004 when he was 12 years old and includes both

mutilation of his scrotum and was diagnosed by Centurion staff with "mood-swings; gender dysphoria; bipolar disorder; and other issues" as well as "self-harming behavior." FDOC staff was instructed "to provide safety utensils, no bones in [Cornwell's] food, and a Styrofoam tray to prevent further self-harm."

Cornwell continued to engage in self-harming behavior throughout 2023, including forceful headbanging against the cell wall in May, an attempt to smuggle Visine into his cell in June,[6] attempted self-castration in June, and additional attempted self-harm in July. Additional self-harm attempts were documented throughout the summer and fall of 2023, culminating in a suicide attempt in late November that resulted in Cornwell being hospitalized.

Cornwell had been placed in the Self-Harm Observational Status (SHOS) housing unit after the attempted self-harm in July. He was returned to the general population in "early December 2023" after he was released from the hospital.

Around the same time that Cornwell returned to the general population, he stopped receiving the drug that he had been prescribed to help with his suicidal behavior because it "was no longer on the formulary." He was, however, approved for a different drug.

---

property offenses (including the theft of an ambulance) and violent offenses—as well as an extensive mental health history with multiple commitments to the state psychiatric hospital.

[6] The complaint alleges that Visine is "a potentially lethal substance" when orally ingested.

Cornwell's self-harming behavior escalated in late January 2024. On January 24, Cornwell "mutilated [his] forearms and scrotum and started to bleed out." He was taken to the prison infirmary, and the lacerations to his arm and scrotum were repaired with sutures by Centurion nursing staff.

That same day, Cornwell was evaluated by a Centurion mental health counselor and he told her: "I'm not okay," "I'm willing to die," and "I don't care if I die. There's nothing that can numb the pain." Cornwell was also seen that day by Centurion's mental health director, Defendant Jeremy Shiver (Dr. Shiver).

Cornwell told Dr. Shiver that he committed the self-harm with his fingernails, but Dr. Shiver found that explanation to be "highly suspect" because "the laceration was notably precise and clean for such a method." Despite that assessment, Dr. Shiver "did not follow up to determine whether [Cornwell] possessed any contraband or other items that could be used to commit further self-harm."

The following day (January 25), Cornwell was seen by a "psychiatric clinician" who requested authorization for Plaintiff to continue receiving a drug for his bipolar disorder. That same day, Cornwell was taken to the infirmary at SRCI because he was "tachycardiac[7] and in distress."

The following morning (January 26) at 1:30 a.m., Cornwell was transported to the hospital. Hospital staff diagnosed Cornwell with anemia due to acute blood

[7] Tachycardia is the medical term for a resting heart rate that exceeds 100 beats per minute.

loss and recommended that he stay in the hospital at least two nights. But "due to intervention by agents and employees of Centurion," Cornwell was discharged from the hospital around 10 a.m. the following morning (January 27) and returned to SRCI a little after 11:30 a.m.

Upon his return from the hospital, nursing staff bandaged Cornwell's wounds, and Defendant Sheila Melvin (Nurse Melvin) directed Cornwell be put in a cell "in [the] Q Dormitory to continue inpatient mental health care." That cell was presumably in the SHOS because the complaint alleges that Cornwell did not have a cellmate and that he was "under observation with 15-minute safety and security checks."

At some point before 1:00 p.m., Cornwell "committed self-harm" by re-opening the wounds that had been sutured closed on January 24. Defendant Valerie Boatwright (Officer Boatwright) noticed blood in Cornwell's cell during a security check, and she radioed for additional units to respond. Defendant Hailey Lynn-Marie Monroe (Officer Monroe) responded to the call, and when she arrived, Cornwell was "laying on [his] side with [his] eyes open" and not responding or moving.

Officers Monroe and Boatwright radioed for additional assistance. Defendant Timothy Michael Trainer (Officer Trainer) and another officer (not a defendant) arrived and transported Cornwell to the infirmary.

Defendant Kristina Tichenor (Nurse Tichenor) assessed Cornwell's wounds when he arrived at the infirmary. Defendants Rebecca Price (Nurse Price), Steve Jones (Nurse Jones), and Nurse Melvin were also present. Nurse Melvin was "assigned as the medical director of the facility" because no medical doctors were at the facility at the time and the "on-call doctor" was offsite.

Cornwell was borderline hypotensive[8] with a blood pressure reading of 93/60 when he arrived in the infirmary. He also verbally expressed an intent to continue harming himself when he returned to his cell.

The complaint does not allege what, if any, medical care was provided by Nurses Tichenor, Price, Melvin, and Jones. It merely alleges that they did not take any steps "to ensure that Cornwell received emergency medical attention for blood loss."

The nursing staff (the complaint does not identify precisely who) discharged Cornwell back to his cell in the SHOS with instructions that he be evaluated every six hours. Officer Trainer and another officer returned Cornwell to his cell around 2:00 p.m.

Shortly thereafter, during a 15-minute check, Officer Boatwright observed Cornwell "facing the back of the cell with blood present." She asked Cornwell what

[8] Hypotensive is the medical term for having low blood pressure.

he was doing, and Cornwell "bit [his] arm," "proceeded to reopen the wound," and responded, "what do you think I'm doing?"

Officer Boatwright radioed for assistance, and Officer Monroe and Defendant Deone Johnson (Nurse Johnson) arrived. Nurse Johnson instructed the officers to bring Cornwell back to the medical unit.

Officer Trainer and another officer transported Cornwell to medical. During the transport, Cornwell "exposed [his] genitals and defecated on the floor." Then, after he arrived in the medical unit, Cornwell "told everyone there that [he] defecated" and "had HIV and wanted to 'contaminate' the officers and nurses before dying."

Nurse Johnson, Defendant Daniel Winfree (Nurse Winfree), Nurse Melvin, and Nurse Price "cleaned and re-dressed [Cornwell's] wounds" and discharged him back to his cell in the SHOS around 2:30 p.m. Nurse Tichenor issued a staff referral for Cornwell to see a mental health provider, but neither she nor any of the other defendants took Cornwell to see a doctor or psychiatrist for emergency care or asked security staff to take any steps to prevent further self-harm.

About an hour later, around 3:30 p.m., Cornwell committed self-harm for the third time that day. Officer Monroe observed him "on the floor [of his cell] in a pool of blood and not responding."

Officer Monroe radioed for assistance and other officers arrived. One of the other officers (not a defendant) transported Cornwell to the infirmary in a wheelchair. Cornwell was covered in feces and dried blood, and he again stated that he wanted to die.

Nurse Winfree addressed Cornwell's wounds and issued another mental health referral around 4:00 p.m. Nurse Price instructed staff that Cornwell would remain in medical until she could confer with Nurse Melvin.

At some point thereafter (the complaint does not say how long), Nurse Melvin instructed staff to discharge Cornwell back to his cell. Less than an hour later, before Nurse Melvin's instruction could be carried out, Cornwell died in the infirmary.

The medical examiner determined that the cause of Cornwell's death was "suicide, with complications from self-inflicted incised wounds." It was also noted that Cornwell had "anemia secondary to blood loss from wounds."

Plaintiff claims that the inadequate care that Cornwell received from Centurion medical and mental health staff leading up to his death was not an isolated incident and was just another example of Centurion's widespread "profit-motivated policies and practices" that "prioritize profit over patients." In support of that claim, the complaint primarily relies on other lawsuits filed against Centurion in Florida and its corporate affiliates in other states alleging that inmates had received inadequate medical care.

Plaintiff seeks an unspecified amount of damages (compensatory, punitive, and nominal) on behalf of Cornwell's estate and survivors "for [Defendants'] failure to prevent [] Cornwell's preventable death."

## Procedural Background

In May 2026, Plaintiff filed this action against Defendants. The complaint asserts four claims: "deliberate indifference to a strong likelihood of self-harm" under 42 U.S.C. §1983 against the Officer Defendants and the Nurse Defendants[9] (Count I); "deliberate indifference to a strong likelihood of self-harm" under §1983 against Dr. Shiver (Count II); "failure to treat" under §1983 against the Officer Defendants and the Nurse Defendants (Count III); and "*Monell*[10] liability" against Centurion (Count IV).

The Officer Defendants and the Centurion Defendants responded to the complaint with separate motions to dismiss under Fed. R. Civ. P. 12(b)(6). The motions are fully briefed. Oral argument was not requested on either motion, and the Court sees no need for it. Thus, the motions are ripe for disposition.

## Standard of Review

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[9] All Medical Defendants except Dr. Shiver.

[10] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When reviewing a motion to dismiss under Rule 12(b)(6), the Court must "accept[ ] the complaint's factual allegations as true and constru[e] them in the light most favorable to the plaintiff[ ]." *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1177 (11th Cir. 2025). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.*

Each motion to dismiss will be evaluated under these standards—starting with the Officer Defendants' motion.

**Officer Defendants' Motion**

The Officer Defendants argue (1) Counts I and III fail to state plausible deliberate indifference claims against them, and (2) they are entitled to qualified immunity from those claims in any event. The Court agrees with the first argument, so it need not consider the second argument.

Counts I and III are both "deliberate indifference" claims, but they are based on deliberate indifference to different things. Count I alleges that the defendants

named in that count (including the Officer Defendants) were deliberately indifferent to the likelihood that Cornwell would harm himself because they repeatedly sent him back to his cell despite knowing that he previously harmed himself there and that he expressed the intention to do so again, whereas Count III alleges that the defendants named in that count (including the Officer Defendants) were deliberately indifferent to Cornwell's need for more acute medical care than wound cleaning and rebandaging based on his extensive blood loss and hypotension. Despite those differences, the same legal standards apply to Counts I and III because "there's only one Eighth Amendment, and only one deliberate-indifference standard." *Wade v. McDade*, 106 F.4th 1251, 1259 (11th Cir. 2024).

"[T]o establish liability on an Eighth Amendment 'deliberate indifference' claim, a plaintiff must satisfy both an objective and a subjective element." *McClinton v. Warden, Baldwin State Prison*, 2026 WL 3369907, at *4 (11th Cir. Nov. 6, 2026). First, the plaintiff must show "that he suffered a deprivation that was, 'objectively, sufficiently serious.'" *Wade*, 106 F.4th at 1262 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Second, the plaintiff must demonstrate that the defendant acted with 'subjective recklessness as used in the criminal law.'" *Id.* (quoting *Farmer*, 511 U.S. at 839).

Here, the Officer Defendants do not argue that the objective element is not adequately pled, and the lacerations that Cornwell inflicted on his arms and scrotum

plainly qualify as an objectively serious medical need because the lacerations and resulting blood loss were conditions that a lay person would (and the Officer Defendants did) recognize needed medical attention. *See Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (explaining that a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention") (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (explaining that the medical need must be "one that, if left unattended, 'pos[es] a substantial risk of serious harm'") (quoting *Farmer*, 511 U.S. at 834). Likewise, the complaint plausibly alleges that Cornwell had an objectively serious mental health need based on the repeated acts of self-harm that he engaged in on January 27 (and before) and the fact that he was under "inpatient mental health care" in the SHOS with constant observation and 15-minute safety and security checks. Thus, resolution of the Officer Defendants' motion to dismiss turns on whether Plaintiff adequately pled the subjective element of a deliberate indifference claim.

The subjective element requires the plaintiff to prove that (1) "the official was subjectively aware that the inmate was at risk of serious harm," (2) "the official disregarded that risk," and (3) "the [official] acted with subjective recklessness as used in the criminal law," meaning the official "was actually, subjectively aware that

his own conduct caused a substantial risk of serious harm to the [inmate]." *Wade*, 106 F.4th at 1255, 1262. However, "even if the [official] 'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable under the Cruel and Unusual Punishments Clause' if he 'responded reasonably to the risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 844–45). "A reasonable decision does not have to be a perfect decision, and it does not require that any potential harm was actually averted." *Stalley v. Cumbie*, 124 F.4th 1273, 1287 (11th Cir. 2024) (citing *Farmer*, 511 U.S. at 844)).

"[I]n a prison suicide case, deliberate indifference requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.'" *Snow ex rel. Snow v. City of Citronelle, AL*, 420 F.3d 1262, 1268 (11th Cir. 2005) (quoting *Cook ex rel. Est. of Tessier v. Sheriff*, 402 F.3d 1092, 1115 (11th Cir. 2005)). "[T]he combination of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide." *Gish v. Thomas,* 516 F.3d 952, 955 (11th Cir. 2008) (emphasis omitted).

"Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835–36 (11th Cir. 1990). "[P]rison

officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care," and "failure to notify competent officials of an inmate's dangerous psychiatric state can constitute deliberate indifference." *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (explaining that a prison guard is deliberately indifferent by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed").

"The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). Prison officials are "on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." *Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020) (emphasis in original).

"Each individual Defendant must be judged separately and on the basis of what that person knows." *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015) (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).

Here, the Officer Defendants argue that the complaint fails to plausibly allege that they acted with deliberate indifference because they responded reasonably to

the risk of harm to Cornwell by calling for assistance and transporting him to medical after each of the self-harm incidents. Plaintiff concedes that the claims against Officer Boatwright should be dismissed because her involvement in the events leading up to Cornwell's death was "limited," but she argues that Officers Monroe and Trainer "stand on very different footing" because they were present throughout the day and did nothing to protect Cornwell from committing self-harm even though they "had reason to believe that the nurses were not taking the steps required to stop [his] ongoing suicide attempt." The Court agrees with the Officer Defendants.

Officer Monroe and Trainer's involvement in the events leading up to Cornwell's death were just as limited as Officer Boatwright's involvement. Officer Monroe responded to Officer Boatwright's calls for assistance after the first two self-harm incidents on January 27 and she made the call for assistance after the third self-harm incident that day. Officer Trainer's only involvement was transporting Cornwell to medical and back to his cell after the first and second incidents of self-harm, and neither he nor Officer Monroe were involved in the decision to return Cornwell to his cell.

The fact that both Officer Monroe and Officer Trainer were subjectively aware that Cornwell was a suicide risk based on their observations of him throughout the day is not enough to establish liability because, under *Wade*, Plaintiff must show that the Officers' "own actions or inactions … put [Cornwell] at substantial risk of

serious harm." *Wade*, 106 F.4th at 1258. The complaint does not make that showing.

Officer Monroe's actions—responding to Officer Boatwright's calls for assistance after the first two incidents of self-harm and calling for assistance after the third incident of self-harm—did not put Cornwell at risk of harm and, to the contrary, was a reasonable and appropriate response to that risk. *See Stalley*, 124 F.4th at 1287 (explaining that a correctional officer's decision to "run an inmate to a medical unit to provide medical care is a reasonable response to a potential medical emergency") (cleaned up); *cf. McCarley v. Dunn*, 722 F. Supp. 3d 1242, 1265 (N.D. Ala. Mar. 7, 2024) (stating a claim for deliberate indifference where the prison officer saw the inmate "on the prison floor, bleeding from multiple injuries," but the officer failed to "render first aid," "transport [the inmate] to the infirmary," or "call for help"). Indeed, the only actions that could conceivably support a deliberate indifference claim would be the Officer Defendants' failure to unilaterally implement (or, at least, recommend) additional safety precautions to prevent Cornwell from harming himself after he was returned to his cell, such as placing him in "five-point restraints." However, the complaint does not allege that Officer Monroe or Officer Trainer were responsible for making that decision.

The Court did not overlook the allegations that at least Officer Trainer was present in the medical unit when Cornwell told the nursing staff that he intended to

continue to harm himself when he was returned to his cell. However, that is not enough to show that Officer Trainer had subjective knowledge that his actions (i.e., returning Cornwell to his cell after nursing staff rebandaged his wounds) were putting Cornwell at a risk of serious harm—particularly since Cornwell would be going back to a cell in the SHOS where he was under observation with 15-minute safety and security checks. Moreover, even if Officer Trainer's actions—complying with medical staff's directive to return Cornwell to his cell after the first and second incidents—put Cornwell at risk of harm, he was "entitled to rely on medical judgments made by medical professionals responsible for prisoner care." *Williams v. Limestone Cnty., Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006); *see also Keith v. DeKalb Cnty. Georgia*, 749 F.3d 1034, 1050 (11th Cir. 2014) (explaining that the plaintiff's theory of liability improperly "aim[ed] to hold [the prison official] liable for *not* disregarding the expert medical opinions of … staff").

On the latter point, the Court did not overlook Plaintiff's argument that correctional officers cannot avoid liability by "blindly deferring to medical staff" when "it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment." Doc. 34 at 24 (quoting *Truschke v. Chaney*, 2018 WL 814579, at *5 (S.D. Ga. Feb. 9, 2018)); *see also Foster v. Maloney*, 785 F. App'x 810, 816 (11th Cir. 2019) ("[A]n inmate or prisoner's medical situation may in some cases be so obviously dire that correctional officers may be held liable regardless of

whether medical personnel are also aware of the situation."). However, under that line of cases, a non-medical prison officer is only deliberately indifferent if the "situation was so obviously dire that [the officer] must have known that a medical professional had grossly misjudged [the inmate's] condition." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1159 (11th Cir. 2010). And, here, the complaint does not plausibly allege that Officer Trainer (or Officer Monroe) had reason to believe that the situation was dire or that nursing staff grossly misjudged Cornwell's medical or mental health condition when they cleared him for return to his cell in the SHOS. *See id.* at 1158–59 (prison officers were not deliberately indifferent where they "had been told by a medical professional that [the inmate complaining of early signs of a miscarriage] was not presenting an emergency, and …knew that a medical professional had spoken with [the inmate] and determined that [the inmate] could wait several hours for further evaluation").

Accordingly, for the reasons stated above, the complaint does not allege plausible claims for deliberate indifference against the Officer Defendants and the claims against them in Counts I and III will be dismissed.

**Centurion Defendants' Motion to Dismiss**

The Centurion Defendants argue that the complaint (1) fails to state plausible deliberate indifference claims against the Medical Defendants, and that it (2) fails to state a plausible *Monell* claim against Centurion. Each argument will be addressed

in turn.

Medical Defendants

Like the Officer Defendants, the Medical Defendants do not dispute that Cornwell had objectively serious medical and mental health needs and they only challenge the subjective element of the deliberate indifference claims. Specifically, the Medical Defendants argue that the complaint does not adequately allege that they each had subjective knowledge of the risk of harm to Cornwell and, regardless, it shows that they responded reasonably to that risk. The Court disagrees, except with respect to Dr. Shiver.

*Nurse Melvin*

The complaint plausibly alleges that Nurse Melvin was subjectively aware that Cornwell was at risk of suicide and in need of more acute medical care because she tended to Cornwell immediately upon his discharge from hospitalization for self-harm; she personally treated Cornwell after the first and second incidents of self-harm; she was aware Cornwell was borderline hypotensive; she heard Cornwell express suicidal intent on at least two occasions; and she was in charge of the medical unit at the time. The complaint also plausibly alleges that Nurse Melvin's own actions caused a substantial risk of harm to Cornwell because she ordered that he be sent back to his cell after the first and second incidents of self-harm with no treatment beyond re-bandaging the wounds and with knowledge that Cornwell could "bleed

out" if he reopened the wounds as he said that he was going to do. *See Estrada v. Stewart*, 703 F. App'x. 755, 760 (11th Cir. 2017) (reversing dismissal of deliberate indifference claim against doctor who "knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve his condition") (quoting *McElligott v. Foley*, 182 F.3d 1248, 1257–58 (11th Cir. 1999). Accordingly, the claims against Nurse Melvin will not be dismissed.

*Nurses Tichenor and Price*

The complaint plausibly alleges Nurses Tichenor and Price were subjectively aware that Cornwell was a suicide risk and in need of more acute medical care because they each personally observed Cornwell after the first, second,[11] and third incidents of self-harm; they were aware Cornwell was borderline hypotensive; and they heard Cornwell express an intent to continue to engage in self-harm. The complaint also plausibly alleges Nurses Tichenor and Price's own actions caused a substantial risk to Cornwell because they were involved in the decision to discharge him back to the cell without providing any treatment beyond re-bandaging the wounds despite knowing that he intended to re-open the wounds. Accordingly, the claims against Nurses Tichenor and Price will not be dismissed.

[11] The complaint does not specifically allege Nurse Tichenor was involved in re-bandaging Cornwell's wounds after the second incident of self-harm, but it can be inferred from the allegation that Nurse Tichenor issued a staff referral for Cornwell to see a mental health provider after the second incident of self-harm that she had at least observed him in the infirmary at that time.

*Nurse Jones*

Nurse Jones' direct involvement was limited to treatment of Cornwell's wounds after the first incident of self-harm, but the complaint also alleges that he was present with Nurses Tichenor, Price, and Melvin when Cornwell was assessed after that incident and that he was aware that Cornwell was borderline hypotensive and intended to continue to engage in self-harming behavior. Despite that knowledge, Nurse Jones agreed to discharge Cornwell back to his cell without ordering any additional precautions to prevent further self-harm. Thus, as was the case with Nurses Melvin, Tichenor, and Price, the complaint plausibly alleges that Nurse Jones' own actions caused a substantial risk because he agreed to discharge Cornwell back to the cell with the knowledge that Cornwell had self-harmed, that Cornwell was hypotensive as a result of the self-harm, and that Cornwell was at risk of bleeding out if he continued to engage in self-harm as he said he was going to do. Accordingly, the claims against Nurse Jones will not be dismissed.

*Nurses Johnson and Winfree*

The complaint alleges that Nurses Johnson and Winfree cleaned and re-bandaged Cornwell's wounds after the second incident of self-harm, heard Cornwell express an intent to "contaminate" staff before he died, and agreed to discharge Cornwell back to the cell. These allegations are sufficient to show that Nurses Johnson and Winfree were subjectively aware Cornwell was a suicide risk and that

their actions (i.e., agreeing to discharge Cornwell back to his cell without providing any treatment beyond re-bandaging his wounds and not ordering any precautions to prevent him from re-opening the wounds) put Cornwell at substantial risk of serious harm (i.e., bleeding out) if he re-opened his wounds in his cell as he said that he was going to do. Accordingly, the claims against Nurses Johnson and Winfree will not be dismissed.

*Dr. Shiver*

Unlike the other Medical Defendants, Dr. Shiver is not alleged to have seen Cornwell on the day he died. Dr. Shiver only saw Cornwell once, on January 24, before he was sent to the hospital for the self-inflicted lacerations to his forearms and scrotum.

Plaintiff claims that Dr. Shiver was deliberately indifferent to Cornwell's risk of self-harm because even though he found it "highly suspect" that Cornwell cut himself with his fingernails, he failed to investigate whether Cornwell possessed any contraband that could be used to harm himself. That, however, is insufficient to state a plausible deliberate indifference claim against Dr. Shiver for two reasons.

First, Dr. Shiver's alleged failure to follow up on his suspicions and check for items of contraband is, at most, negligence, not deliberate indifference. *See McClinton*, 2026 WL 3369907, at *5 ("[A] constitutional violation occurs only when prison officials act 'consciously' such that their acts or omissions knowingly have

the effect of inflicting a punishment upon prisoners."). Indeed, it is well-established that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [the Supreme Court's] cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Second, the complaint fails to allege a causal connection between Dr. Shiver's failure to follow up on his suspicions and the injuries that Cornwell suffered three days later after he returned from the hospital. *See Stalley*, 124 F.4th at 1283 ("To prevail on a claim of deliberate indifference, plaintiffs … must establish a 'necessary causal link' between the challenged conduct and their injuries.") (quoting *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019). There are no allegations that Cornwell did in fact self-harm with an object rather than fingernails and, to the contrary, the complaint alleges that Cornwell used his fingernails and his teeth to reopen the wounds. Thus, Plaintiff has not shown a causal connection between Dr. Shiver's alleged failure to follow up on his suspicions and Cornwell's death.

The Court did not overlook Plaintiff's argument that Dr. Shiver did nothing after Cornwell was discharged from the hospital on the morning of January 27 to ensure that he was assessed by a mental health provider or received adequate mental health care. However, even if it is true that Dr. Shiver did not follow up on Cornwell's mental health status following his return from the hospital, that is at most negligence, not deliberate indifference. *See Bennett v. Ford*, 2025 WL 718712, at

*7 (N.D. Fla. Feb. 20, 2025) ("[E]ven if it would have been 'prudent' for [the officer] to [have had the inmate assessed by a mental health professional], that is at most ordinary negligence.").

Accordingly, Plaintiff has not stated a plausible deliberate indifference claim against Dr. Shiver and the claim against him in Count II of the complaint will be dismissed.

* * *

The Court did not overlook the Centurion Defendants' argument that the Nurse Defendants responded reasonably to the risk of harm to Cornwell because they are not alleged to have "denied or intentionally delayed any care" and they took action by "addressing [Cornwell's] wounds, ordering further monitoring, [and] submitting requests for [Cornwell] to be seen and evaluated by a higher level of mental health care." The Court disagrees—at least at this stage of the case.

First, the complaint *does* allege the Nurse Defendants denied Cornwell necessary treatment for his anemia and hypotension. Specifically, the complaint alleges that instead of sending Cornwell back to the hospital due to the amount of blood that he lost throughout the day, the Nurse Defendants simply sent Cornwell back to his cell without providing any treatment other than cleaning and re-bandaging his wounds despite knowing that he was at risk of "bleeding out" if he continued to reopen the wounds as he repeatedly said that he was going to do.

Second, the complaint plausibly alleges that the medical treatment provided by the Nurse Defendants was not a reasonable response to the serious risk of harm that Cornwell was facing. "Federal and state governments … have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020). Yet, here, the Nurse Defendants did nothing more than repeatedly re-bandage life-threatening wounds, allowing Cornwell to slowly bleed out. *See Estrada*, 703 F. App'x. at 760 (stating a claim for deliberate indifference where the doctor "knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve his condition").

Third, even though the nursing staff issued "referrals" for Cornwell to see a mental health provider after the second and third incidents of self-harm on January 27, the Court cannot determine at this stage of the case whether those referrals were sufficient to address Cornwell's serious mental health needs. For example, there does not appear to be any reason why a mental health referral could not have been made after the first incident of self-harm that day or why the nursing staff could not have recommended that additional measures be put in place until Cornwell was assessed by a mental health provider to reduce the chance that he would engage in additional self-harm before then.

In sum, for the reasons stated above, the complaint states plausible deliberate indifference claims against the Nurse Defendants—with respect to both the likelihood of self-harm (Count I) and the need for more acute medical care (Count III)—but not Dr. Shiver (Count II).[12]

Centurion

"A private entity, like Centurion, is subject to liability under section 1983 when it 'performs a function traditionally within the exclusive prerogative of the state,' such as contracting with the county to provide medical services to inmates because it becomes 'the functional equivalent of the municipality.'" *Ingram v. Fla. Dep't of Corr.*, 829 F. Supp. 3d 1127, 1149 (S.D. Fla. 2026) (quoting *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 940 (11th Cir. 2017)). To establish municipal liability under §1983, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

---

[12] Of course, the fact that the complaint pled enough to withstand the motion to dismiss the claims against the Nurse Defendants does not mean that those claims will withstand summary judgment after discovery. Indeed, the disposition of those claims may depend on what discovery shows regarding the actual extent of each nurse's involvement in Cornwell's treatment and the decisions to send him back to his cell rather than to the hospital for more acute care, the mental health referrals, and nursing staff's involvement in recommending protective measures for suicidal inmates in the SHOS.

A policy is "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir. 1997). A custom is "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (cleaned up). "In other words, a longstanding and widespread practice [may be] deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Id.*; *see also Sewell,* 117 F.3d at 489 ("A custom is a practice that is so settled and permanent that it takes on the force of law.").

"[R]andom acts or isolated incidents are insufficient to establish a custom or policy." *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986); *see also McDowell*, 392 F.3d at 1290 (explaining that liability may not be imposed "based upon an isolated incident" and "the incident must result from a demonstrated practice"). And "[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees." *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011).

Here, Plaintiff alleges that Centurion has widespread "profit-motivated policies and practices" that "prioritize profit over patients" by, among other things,

allowing patient medical care to be directed by nurses rather than doctors and discouraging practitioners from referring patients in need of acute care to the hospital. In support of those conclusory allegations, the complaint cites multiple lawsuits in Florida and other states in which Centurion medical staff allegedly failed to provide necessary medical care to inmates in order to save costs.

Most of the cited incidents are not remotely similar to the circumstances of this case. The Florida incidents involved an inmate who was allegedly not sent to a specialist for prostate cancer; a wheelchair bound inmate who died after medical staff failed to order any tests or evaluate his complaints of nausea, vomiting and incontinence; and an inmate who was not sent out for skin cancer surgery because she was close to her release date. The out-of-state incidents involved an inmate who died in his cell after being pepper sprayed; an elderly inmate who was prescribed Tylenol for a hernia; an inmate who was not treated for hepatitis and developed cirrhosis of the liver; and an inmate who lost the ability to walk after his back pain went unaddressed.

The only two incidents mentioned in the complaint that involved mental health treatment or suicide allegedly occurred in New Mexico at some point prior to 2022. However, even if those two out-of-state incidents are relevant to Centurion's

customs and policies,[13] they are not enough, standing alone, to establish "a practice that is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d at 489; *see also Whitaker v. Miami-Dade Cnty.*, 126 F. Supp. 3d 1313, 1321 (S.D. Fla. 2015) (finding that "four isolated shootings in 2012 cannot establish a widespread practice") (cleaned up); *Charudattan v. Darnell*, 510 F. Supp. 3d 1101, 1115 (N.D. Fla. 2020) ("Five posts over the course of more than two years is insufficient to establish municipal liability based on an informal policy or custom."), *aff'd*, 834 F. App'x 477 (11th Cir. 2020).

The Court did not overlook Plaintiff's argument that "[her] *Monell* theory is not that Centurion has a custom of providing inadequate suicide prevention care" but rather is that Centurion "has a custom pursuant to which staff disregard objectively serious symptoms; frequently refuse to send patients to outside care; fail to develop sensible treatment plans; and the like." However, that argument is not persuasive because a plaintiff "cannot plausibly allege a *Monell* claim against [a municipality] by providing a laundry list of events that do not relate to the events of

---

[13] The Centurion Defendants argue that the incidents at non-Florida institutions cannot support a *Monell* claim against Centurion because "medical care at those institutions is rendered by separate and distinct entities with separate correctional policies and procedures not within the purview of Centurion of Florida, LLC or the FD[O]C." The problem with that argument at this stage of the case is that the complaint alleges (and the Court must accept as true) that Centurion is affiliated with "other 'Centurion' healthcare entities that are contracted across the country to provide healthcare to correctional facilities" and that "[e]ach of these corporate affiliates maintain the same policies and practices which Plaintiff alleges were the moving force behind [] Cornwell's death."

this case or even to each other." *Gautam v. City of Sunrise*, 2026 WL 860466, at *6 (S.D. Fla. Mar. 30, 2026); *see also Bennett*, 2025 WL 718712, at *10 (finding no "custom of providing inadequate mental health care to suicidal inmates" because the incidents relied upon "involved materially different circumstances and/or predated the jail's revision of its suicide protocols"). Thus, the broad generalities that Plaintiff relies on to try to connect the events in this case to other instances of allegedly inadequate medical care provided by Centurion are not enough to state a plausible *Monell* claim.

The Court also did not overlook that the district court in *Cineus v. Fla. Dep't of Corr.,* 2022 WL 4448599 (M.D. Fla. Sept. 23, 2022), allowed a *Monell* claim against Centurion to proceed based on similar allegations. That case is not binding precedent. *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) (explaining that "a district judge's decision neither binds another district judge nor binds him"). The case is also distinguishable because the alleged constitutionally inadequate care in that case (i.e., not referring the inmate to an outside provider despite his worsening condition) was substantially similar to the circumstances of the other cases cited in the opinion that, according to the court, showed that "Centurion had a 'persistent and wide-spread practice' of refusing to provide constitutionally adequate medical care to inmates for financial gain." *Cineus*, 2022 WL 4448599 at *6.

The Court also did not overlook the complaint's allegation that Centurion has been "subject to over 100 lawsuits, a Department of Justice investigation, and state audits" as a result of its "profit-motivated policies and practices." However, that allegation does not provide support for the *Monell* claim in this case because there is no indication that those matters involved similar constitutional violations or that any of the suits were found to have merit, and it is well established that "the number of complaints bears no relation to their validity." *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987); *see also Whitaker*, 126 F. Supp. 3d at 1320–21 (dismissing *Monell* claim where complaint identified prior use-of-force incidents by a police department without alleging facts showing that those incidents were found to involve unconstitutional or unjustified uses of force).

Accordingly, the *Monell* claim against Centurion will be dismissed.

**Conclusion**

In sum, for the reasons stated above, it is **ORDERED** that:

1. The Officer Defendants' motion to dismiss (Doc. 26) is **GRANTED**, and the claims against the Officer Defendants in Counts I and III of the complaint are **DISMISSED**.

2. The Centurion Defendants' motion to dismiss (Doc. 28) is **GRANTED in part**, and the claims against Dr. Shiver (Count II) and Centurion (Count IV) are **DISMISSED**. The motion is otherwise **DENIED**.

3. The Clerk shall terminate Centurion, Dr. Shiver, and the Officer Defendants (Boatwright, Monroe, and Trainer) as parties in CM/ECF.

4. The Nurse Defendants have 14 days from the date of this order to answer the claims against them.

**DONE and ORDERED** this 19th day of November, 2026.

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**